911 F.2d 280
 59 USLW 2159
 Bob GEARY; Robert Silvestri; Dennis Mark; Melissa
Gundrun; Wayne Johnson; David Soule; Max Woods; Peter
Johnson; Robert Gebert; Election Action; Terence
Faulkner; and Sudi Trippet, Plaintiffs-Appellees,
v.
Louise RENNE, San Francisco City Attorney; Dianne
Feinstein, San Francisco Mayor; Board of Supervisors, City
and County of San Francisco; City and County of San
Francisco, and Jay Patterson, San Francisco Registrar of
Voters, Defendants-Appellants.
 No. 88-2875.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 25, 1990.
Decided Aug. 14, 1990.
As Amended Aug. 31, 1990.
 
 David Benjamin, Deputy City Atty. and Dennis Aftergut, Chief Asst. City Atty., San Francisco, Cal., for defendants-appellants.
 Arlo Hale Smith, San Francisco, Cal., for plaintiffs-appellees.
 Anthony Saul Alperin, Asst. City Atty., Los Angeles, Cal., for amicus curiae Tom Bradley, Mayor of the City of Los Angeles.
 Cedric C. Chao, Morrison & Foerster, San Francisco, Cal., for amicus curiae California Democratic Party, et al.
 Curtis M. Fitzpatrick, Asst. City Atty., San Diego, Cal., for amicus curiae City of San Diego, et al.
 Ephraim Margolin, San Francisco, Cal., for amicus curiae San Francisco County Democratic Cent. Committee, et al.
 Appeal from the United States District Court for the Northern District of California.
 Before GOODWIN, Chief Judge, WALLACE, TANG, SCHROEDER, ALARCON, REINHARDT, BRUNETTI, KOZINSKI, LEAVY, FERNANDEZ and RYMER, Circuit Judges.
 GOODWIN, Chief Judge:
 
 
 1
 Since at least 1913, California by statute or state constitutional provision has made all city, county, school, and judicial offices nonpartisan. Political parties have no control over the nomination or election processes for those offices. Prior to 1986, however, no law prohibited political party endorsements of candidates running for such offices. Nevertheless, because the legal status of such endorsements was unclear, political parties did not endorse candidates in 75% of California counties. In 1986, the people of California voted overwhelmingly to adopt Proposition 49, which amended the state constitution to formalize the ban on political party endorsements: Article II, Sec. 6(b) provides that "[n]o political party or party central committee may endorse, support or oppose a candidate for nonpartisan office."
 
 
 2
 Plaintiffs-appellees in this case are ten registered voters of the City and County of San Francisco, an organization of registered voters, and one of that organization's officers. The basis of their complaint as it relates to this appeal was the refusal of the City and County of San Francisco and the San Francisco Registrar of Voters (appellants) to permit official political party and party central committee endorsements to be printed in the San Francisco Voter Pamphlet prepared for elections scheduled June 2 and November 3, 1987. Appellants based their refusal to print such endorsements on the language of Article II, Sec. 6(b).
 
 
 3
 On September 11, 1987, plaintiffs-appellees filed suit, and in their third cause of action challenged the constitutionality of Sec. 6(b) and sought injunctive and declaratory relief. They alleged that Sec. 6(b) violates the rights of political parties and their members to free speech and association under the first and fourteenth amendments of the Constitution[1] and to equal protection under the fourteenth amendment.
 
 
 4
 On April 27, 1988, the district court granted the plaintiffs' motion for partial summary judgment with regard to their third cause of action 708 F.Supp. 278, relying in large part on the reasoning of state Supreme Court Justice Grodin's concurring opinion in Unger v. Superior Court, 37 Cal.3d 612, 209 Cal.Rptr. 474, 692 P.2d 238 (1984).[2] On May 6, 1988, the city moved to vacate the district court's judgment and was unsuccessful. This appeal followed.
 
 
 5
 The original panel of this court reversed the judgment, holding that California's compelling interest in preserving its nonpartisan system of government for local and judicial offices justified the infringement of the plaintiffs' first amendment rights effected by Sec. 6(b). 880 F.2d 1062. We took this case en banc in order to reconsider the panel's decision. Upon reconsideration, we affirm the decision of the district court.
 
 
 6
 The broad authority of the states to prescribe the procedures governing local elections "does not extinguish the State's responsibility to observe the limits established by the first amendment rights of the State's citizens." Eu v. San Francisco Democratic Cent. Comm., 489 U.S. 214, 109 S.Ct. 1013, 1019, 103 L.Ed.2d 271 (1989). In reviewing a challenge to a provision of a state's election laws, we first consider whether the provision burdens rights protected by the first and fourteenth amendments. Id. If the enactment at issue impairs the first amendment rights of political parties and their members, "it can survive constitutional scrutiny only if the State shows that it addresses a compelling state interest ... and is narrowly tailored to serve that interest." Id. 109 S.Ct. at 1019-20 (citations omitted); First National Bank of Boston v. Bellotti, 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978).
 
 
 7
 It is indisputable that the restrictions embodied in Sec. 6(b) implicate appellees' first amendment rights. The ban on endorsements directly affects political speech, "the inviolability of which rests at the core of the First Amendment." San Francisco Democratic Cent. Comm. v. Eu, 826 F.2d 814, 833 (9th Cir.1987), aff'd, 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). As the Supreme Court has made clear, "[a]dvocacy of the election or defeat of candidates ... is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy or defeat of legislation." Buckley v. Valeo, 424 U.S. 1, 48, 96 S.Ct. 612, 648, 46 L.Ed.2d 659 (1976). And because the exercise of these basic first amendment freedoms traditionally has been through the media of political associations, political parties as well as party adherents enjoy rights of political expression and association. Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957).
 
 
 8
 Because Sec. 6(b)'s prohibitions do impair appellees' first amendment rights, the burden is on the government to show a compelling state interest justifying the regulation. Eu, 826 F.2d at 833 (quoting Bellotti, 435 U.S. at 786, 98 S.Ct. at 1421). Appellants declare Sec. 6(b) essential to preserving the nonpartisan nature of California's system of electing local and judicial officials and assert that the State's interest in the "fair and impartial administration of government" is compelling enough to warrant Sec. 6(b)'s ban on partisan endorsements.
 
 
 9
 Attempting to avoid the constitutional minefield of claiming first amendment restrictions to be justified for the purpose of preventing "undue influence on voters" and guiding the electorate to make sensible choices, see, e.g., Bellotti, 435 U.S. at 789-91, 98 S.Ct. at 1422-24, appellants characterize their concern as an interest in the end product of Sec. 6(b)'s restrictions on political party speech: i.e., prevention of a return of political party domination of local government and diminished voter confidence in local public officials. See, e.g., Amicus Curiae Brief of Tom Bradley, Mayor of Los Angeles, at 3 (California's concern "does not relate to the impact that endorsements may have on voters' choices but rather to the indirect impact on elected officials' independence from partisan political pressures").
 
 
 10
 As support the State cites Supreme Court cases upholding limits on campaign contributions and spending, contending that political party endorsements create the same risks of corruption or the appearance of corruption that the Court previously has determined justify governmental regulation of election spending. The analogy is flawed. In its most recent pronouncement in this area, Austin v. Michigan Chamber of Commerce, --- U.S. ----, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), the Court upheld a provision of the Michigan Campaign Finance Act prohibiting corporations from using general treasury funds for independent expenditures in connection with state candidate elections. In its defense Michigan contended that the unique legal and economic characteristics of corporations necessitated some regulation of their political expenditures in order to avoid corruption or the appearance of corruption. Id. at 1397. Affirming that, in previous cases, "[w]e ... have recognized that 'the compelling governmental interest in preventing corruption support[s] the restriction of the influence of political war chests funneled through the corporate form,' " id. (quoting FEC v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 500-01, 105 S.Ct. 1459, 1470, 84 L.Ed.2d 455 (1985) (NCPAC )), the Court found the Michigan statutory provision a legitimate check upon "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the [state-conferred] corporate form and that have little or no correlation to the public's support for the corporation's political ideas." Id. at 1397.
 
 
 11
 The corruption the Court found properly addressed by the Michigan statute was not of the kind decried by California here. Under the definition applied in past cases, "[c]orruption is a subversion of the political process" whereby "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." NCPAC, 470 U.S. at 497, 105 S.Ct. at 1468; see also Austin, 110 S.Ct. at 1421 (Kennedy, J., dissenting). "The hallmark of corruption is the financial quid pro quo: dollars for political favors." NCPAC, 470 U.S. at 497, 105 S.Ct. at 1468.
 
 
 12
 By contrast, the Court explicitly has excluded from its definition the kind of conduct California seeks to prevent with Sec. 6(b): "[t]he fact that candidates and elected officials may alter or reaffirm their own positions on issues in response to political messages ... can hardly be called corruption, for one of the essential features of democracy is the presentation to the electorate of varying points of view." Id at 498, 105 S.Ct. at 1468. The rationale underlying "the long history of regulation of corporate political activity" thus simply is not available as a justification for the complete suppression of speech by political parties, regardless of whether the elections in question are partisan or nonpartisan in nature. See FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 256, 107 S.Ct. 616, 627, 93 L.Ed.2d 539 (1986) (MCFL ) (emphasis added). As the Court said in exempting Massachusetts Citizens for Life, a nonprofit organization dedicated to promoting respect for the rights of the unborn, from Federal Election Campaign Act (FECA) prohibitions on corporate expenditures of treasury funds on behalf of federal candidates:
 
 
 13
 [such groups] do not pose [any] danger of corruption. MCFL was formed to disseminate political ideas, not to amass capital. The resources it has available are not a function of its success in the economic marketplace, but its popularity in the political marketplace.
 
 
 14
 Id. at 259, 107 S.Ct. at 628-29 (emphasis added). That description applies equally well to the political parties targeted by Sec. 6(b).
 
 
 15
 In Eu we considered a similar ban on partisan endorsements before party primaries in California. Finding that "[w]ith the exception of cases upholding laws carefully tailored to proscribe fraud and corruption," the State had "cite[d] no authority for the proposition that the government can regulate the flow of information between political associations and their members," we held that the ban "patently infringe[d] both the right of the party to express itself freely and the right of party members to an unrestricted flow of political information." 826 F.2d at 835.
 
 
 16
 Appellants assert that Eu is distinguishable because it involved party endorsements in elections for partisan offices and because the state interest advanced here--i.e., in preventing the appearance or reality of "corruption" of nonpartisan officeholders--is more compelling. Having dealt with the latter contention above, we observe with regard to the first that there is nothing in this court's Eu opinion or the Supreme Court's affirmance of that opinion which suggests that either analysis was in any way dependent upon the fact that partisan offices were at issue. The concern in both fora was with the State's abridgement of the rights of political parties and their members to exchange ideas and information, not with the nature of the elections at issue. See, e.g., 109 S.Ct. at 1020 ("[a] 'highly paternalistic approach' limiting what people may hear is generally suspect, but it is particularly egregious where the State censors the political speech a political party shares with its members") (citations omitted); 826 F.2d at 835 (same).
 
 
 17
 Even if we were to find the state interests underlying Sec. 6(b) compelling, we still would be bound to declare the amendment invalid, because appellants have failed to show that Sec. 6(b) is narrowly tailored to achieve its purported objectives. See Eu, 826 F.2d at 834 (citing Consolidated Edison Co. v. Public Serv. Comm., 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980)). The State claims that Sec. 6(b) is narrowly drawn because only political parties and their county central committees are prohibited from endorsing, supporting, or opposing nonpartisan candidates; individuals are not subject to its restrictions. But as we have noted, supra at 283, political parties as well as party adherents possess rights of expression and association under the first amendment, and the mere fact that Sec. 6(b) targets the collective rather than the individual voices of party members does not suffice to render it "precisely drawn." See Bellotti, 435 U.S. at 777, 98 S.Ct. at 1416 ("[t]he inherent worth of [political] speech ... does not depend upon the identity of its source, whether corporation, association, union, or individual").
 
 
 18
 Even in the campaign contribution and expenditure cases appellants cite as support for their position, the Supreme Court consistently has emphasized the limited nature of the restrictions it has upheld and the availability of alternative avenues of expression for the affected speakers.[3] As the Court observed in Buckley, with regard to the narrow provisions of the FECA it found to be constitutional:
 
 
 19
 [s]ignificantly, the Act's contribution limitations in themselves do not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues by individual citizens, associations, the institutional press, candidates, and political parties.
 
 
 20
 424 U.S. at 28-29, 96 S.Ct. at 639-40 (emphasis added). Obviously, the same cannot be said of Sec. 6(b); it imposes a total ban on any partisan gesture of support for or opposition to a candidate. Accordingly, the district court below specifically found that the State could adequately safeguard the interests Sec. 6(b) was designed to protect by less drastic means, including provision for non-partisan methods of nominating candidates for local and judicial offices and controls on partisan activities of the candidates.[4]
 
 
 21
 We therefore reject appellants' assertion that allowing party endorsements will lead inexorably to party usurpation of the nomination process for nonpartisan candidates; the seventy years of nonpartisan government celebrated by appellants were achieved without benefit of a formal ban on partisan advocacy, and the State has offered nothing but speculative evidence to support its contention that the invalidation of Sec. 6(b) will generate a disastrous departure from the experience of the past.[5]
 
 
 22
 We are not unmindful that "the Constitution grants to the States a broad power [to regulate Congressional elections under] Art. I, Sec. 4, cl. 1, which power is matched by state control over the election process for state offices." Tashjian v. Republican Party of Conn., 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986); see also Oregon v. Mitchell, 400 U.S. 112, 124-25, 91 S.Ct. 260, 264-65, 27 L.Ed.2d 272 (1970) (opinion of Black, J., delivering the judgment of the Court) (observing that under the 10th Amendment, one of the powers reserved to the states is the regulation of state elections). But as the Supreme Court has emphasized, the state's power to protect the integrity of its electoral processes "does not justify, without more, the abridgement of fundamental rights, such as the right to vote, see Wesberry v. Sanders, 376 U.S. 1, 6-7, 84 S.Ct. 526, 529, 11 L.Ed.2d 481 (1964), or, as here, the freedom of political association." Tashjian, 479 U.S. at 217, 107 S.Ct. at 550; see also Miami Herald v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) and Mills v. Alabama, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) (striking down on first amendment grounds state election laws interfering with newspapers' rights to comment on political candidates); Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (10th Amendment cannot save legislation prohibited by subsequently enacted fourteenth amendment).[6]
 
 
 23
 Because we find that the ban on partisan endorsements by political parties burdens political speech without being narrowly tailored to serve compelling state interests, we hold that Sec. 6(b) violates the first and fourteenth amendments.[7]
 
 
 24
 AFFIRMED.
 
 
 25
 REINHARDT, Circuit Judge, with whom KOZINSKI, Circuit Judge, joins, concurring:
 
 
 26
 I join fully in Chief Judge Goodwin's opinion for the court. However, in an effort to ensure that no one will be misled by the ostensible teachings of history, I submit this separate concurrence responding to Judge Alarcon's thesis that today's political parties pose a fundamental threat to democratic institutions in California and that their endorsements bring with them the taint of corruption. I also write to comment on the concerns raised in his opinion regarding the independence of California's judiciary.
 
 
 27
 * There is always a danger in too facile an application of the principle that important lessons may be learned from past events. The problem is similar to the one we frequently experience with those who claim to be expert in determining the original intent of our founding fathers. In both cases, it is the level of generality that is critical, and that so badly confounds the pseudo-experts. In short, "students" sometimes learn the wrong lesson from history--they discern the wrong message not by getting the historical facts wrong but by concentrating on superficial statements or inferences rather than on the fundamental principles that underlie them. For example, it is certainly true, as a matter of historical fact, that the American colonists found it necessary to be vigilant against roving bands of Indians. However, for a modern student of our early history to draw from that fact the lesson that we must today be constantly on the alert against "predatory" Native Americans would be rather foolish. On the other hand, to learn, as a result of our early experience, a more fundamental lesson--namely, that individuals may find it necessary to band together in their common defense--might show a modicum of wisdom.
 
 
 28
 In the case at hand, it does not take much wisdom to know that, whatever the cause of the problems in municipal government in the early 1900s, today's threat to the integrity of the political process comes not from the Republican or Democratic parties--or even from the Libertarians--but rather from the corrupting influence of money in politics--that is, from massive political contributions. All recent California governors have, of course, been nominated by political parties, while California mayors have, since the days noted by Judge Alarcon, been elected in nonpartisan races. Yet there is no reason to think that recent governors, like Pat Brown, Ronald Reagan, Jerry Brown, and George Deukmejian, have been more subject to corruption, in any form, than mayors, like Pete Wilson, Dianne Feinstein, Tom Bradley, Sam Yorty, and Joe Alioto. In fact, today's problems concerning the lack of integrity in government may well stem in substantial part from the weakening of the political party system, both locally and nationally. Throughout the nation, candidates no longer can look to the party to assume responsibility for the cost of their campaigns. Conversely, parties no longer can impose discipline on individuals elected to office as the party's standard bearers. These days public officials and would-be public officials must go directly to the big monied interests and beg for the funds necessary to finance their campaigns. In modern-day America, there simply is no reason to associate partisanship with corruption.
 
 
 29
 There is a basic fallacy in Hiram Johnson's notions of reform. Eliminating the middle-man does not do much to solve the fundamental problem of corruption. In fact, in this case it may have exacerbated it. We are told that in the early 1900s the Southern Pacific Railroad was the villain, that it controlled both the legislature and the political parties. Strangely, while Johnson's reforms deliberately weakened the party structure, they left the Southern Pacific wholly untouched, free to contribute, free to endorse, free to promote its own candidates regardless of their ideology. Accordingly, the reforms not only compelled candidates to deal directly with the Southern Pacific and its lobbyists, but made them more dependent on the railroad's contributions.[1] Political reforms are always well intended. Frequently, however, they, like ill-thought-through history lessons, address only the superficial evil and fail to consider the underlying problem.
 
 
 30
 That is not to say that the people of California do not have the right to use a system of nonpartisan elections for filling local and judicial offices. No one quarrels with that right. But the people of California may not suppress free speech on the excuse that they are merely determining the method by which candidates will be elected. For nearly eighty years, California's local and judicial elections have been "nonpartisan." Traditionally, and as California has applied the term, a nonpartisan election means that the candidates who appear on the general-election ballot are not selected by political parties. Cal.Elec.Code Sec. 37. Anyone can run in the primary, not just persons registered in a particular political party. E.g., Cal.Elec.Code Secs. 22836 & 25301. If any one of the primary candidates in a nonpartisan election receives a majority of the votes, he is elected; otherwise, the two individuals who receive the highest number of votes face each other in the general election. Cal.Elec.Code Secs. 6611, 6612, & 7202. In any event, all citizens, regardless of party affiliation, are eligible to participate in all stages of the nonpartisan election process.[2]
 
 
 31
 California may continue to hold elections that are nonpartisan in the traditional sense. But there is all the difference in the world between refusing to delegate to political parties the decision as to which candidates appear on the general-election ballot and prohibiting political party organizations from announcing their views on the merits of candidates seeking public office. The latter directly infringes on the right of free speech. As the Supreme Court has stated, "[T]he first amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." Eu v. San Francisco County Democratic Central Committee, 489 U.S. 214, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989). Prohibitions on endorsements "directly hamper[ ] the ability of a party to spread its message and hamstring[ ] voters seeking to inform themselves about the candidates and the campaign issues." 109 S.Ct. at 1020. "[I]t is particularly egregious where the State censors the political speech a political party shares with its members." 109 S.Ct. at 1020.
 
 
 32
 The issue, in short, is not a matter of how to define or structure a "nonpartisan election." It is instead a question of the right of individuals to band together and express their collective views on a matter of public concern.[3] Unless the state can demonstrate a compelling need to do so, it cannot limit such speech. That the speech is collective rather than individual is of no import. The state may no more prevent Republicans in Los Angeles County from announcing their collective position on candidates for nonpartisan office than it could prevent an individual Republican party member from running for a nonpartisan office, or from proclaiming during the campaign that he is a member of the Grand Old Party and that he intends, if elected, to follow its tenets unswervingly. Similarly, of course, the state could not prevent members of political parties from voting in an election to select a nonpartisan office-holder. While the state may have a compelling interest in maintaining its nonpartisan election structure for certain offices, there are obvious limits to what it may concern itself with. It may select the form of local government it wishes and prescribe procedures for its implementation; however, it has no compelling interest in limiting the people's right to make informed choices or to select candidates for office on whatever basis they deem relevant.
 
 
 33
 The dissent's description of California's populist reforms should not inadvertently mislead anyone into believing that Hiram Johnson and his reformers long ago enacted a prohibition against endorsements in nonpartisan elections. The reformers were not that out of touch with our Constitution. To the contrary, political parties were free to make endorsements in nonpartisan races in the period following the Johnson reforms, right up until 1986. Only then did the voters adopt the no-endorsement rule that Judge Alarcon now finds so essential to the preservation of the republic. Until the adoption of the initiative measure in 1986, political parties were free to, and did, endorse in numerous nonpartisan elections. As Justice Mosk wrote in Unger v. Superior Court, in California it was "customary for the governing bodies of political parties to endorse or assist candidates in elections for nonpartisan office."[4] And prior to 1986, few thought that the political process was in any great danger as a result. Thus, historical events of the early 1900s cannot provide the basis for limiting the free speech rights of today's California Democrats, Republicans, and minor party members. Nor can the limitation of that speech be deemed necessary to the proper functioning of the nonpartisan election system. In reaching those conclusions, I note that nowhere in the record is there a whit of evidence that party endorsements in nonpartisan elections ever, even on a single occasion, led to corruption or evil of any kind--almost eighty years of endorsements in nonpartisan races and not one example of a public official being unduly or improperly influenced.[5]
 
 
 34
 In fact, recent experience tends to suggest that the influence of party organizations is not nearly as great as Judge Alarcon fears. Only a few months ago the California Democratic party made endorsements in the statewide partisan primary for the first time. The endorsed candidates for Governor and Insurance Commissioner, the only two seriously contested statewide posts for which endorsements were made, both lost by substantial margins. In nonpartisan races, the voice of political party organizations is likely to be even less effective. Ordinarily endorsements in those races are made on a local level; there, the endorsing bodies are the county central committees, which are notoriously uninfluential organizations. In any event, in nonpartisan races, as in partisan ones, the party's voice is but one of many that seek, whether for selfish or idealistic reasons, to persuade voters to cast their ballots one way or the other. The only difference is that in nonpartisan races the party's voice is even more attenuated since its message is directed not only at its own members but at the electorate at large.
 
 
 35
 As I have already noted, political parties have the same right as others to make their views known; their speech may not be suppressed unless the state can demonstrate that it is necessary to do so for compelling reasons. Eu, 109 S.Ct. at 1019-20. It is also important to note that the result would be no different here even if political parties' endorsements carried great weight and influenced voters inordinately. For speech cannot be prohibited on the ground that it is effective.[6] In any event, in this case those arguing that a compelling governmental interest warrants limiting the right of members of political parties to make known their collective views have completely failed to carry their burden.
 
 II
 
 36
 * Judge Alarcon's dissent touches on a critical and sensitive subject when it discusses the question of the independence of the California state judiciary--and the threat to that independence that purportedly arises when political parties are free to express their views regarding the qualifications or records of candidates for judicial office. My colleague's argument is paradoxical indeed, and, implicitly but unavoidably, raises the basic question whether judges who are forced to stand for election can be independent. The threat to the independence of elected judges stems from the fact that they are dependent for their livelihood and continued employment on the political process. They must all stand for election at one time or another, either initially, shortly after their appointment, or at the end of their first and subsequent terms. Cal. Const. art. VI Sec. 16. Some raise large sums of money and seek support from persons and pressure groups with particular interests that will come before them. Judicial candidates are rated by various interest groups and are questioned about their decisions--sometimes about the very issues listed in Judge Alarcon's dissent. None of this appears to cause my dissenting colleague any concern--except for the fact that one of the groups that may endorse a judicial candidate may be a political party organization.
 
 
 37
 The paradox I find in Judge Alarcon's position lies in the assumption that judges can remain independent though compelled to seek financial contributions and other assistance, including endorsements, from powerful special interests and pressure groups, but that their very integrity may crumble if they ask members of a political party publicly to proclaim their collective support. As far as I am concerned, one can make a plausible argument that judges who must run for election cannot be fully independent--that their decisions on controversial issues will be suspect--that they are too susceptible to pressures arising out of personal concerns.[7] Or, on the other hand, one can argue that good judges, being strong-willed, intellectually disciplined, and highly principled, will disregard the effects of being compelled to seek, and accept, the aid of those whose basic interests are regularly at stake in their courts. But it cannot be seriously argued, in my view, both that the typical judge is strong enough to ignore the temptation to succumb to the influence of those who can truly control his destiny--the powerful interests, the big contributors, even the governor who has it solely within his power to make a career advancement possible[8]--and, at the same time, that the typical judge is so weak, morally or ethically, that he will not be willing to disagree in subsequent judicial opinions with so much as a single plank of the platform of a political party that has given him nothing more than its endorsement. That argument simply does not make sense.
 
 B
 
 38
 We can, of course, learn from history, and the events surrounding recent judicial elections in California shed significant light on the problem we are asked to resolve. In the 1986 statewide general election, three members of the California Supreme Court, including the Chief Justice, were voted out of office because a majority of the electorate disagreed with the perceived views of those justices on controversial issues. The election was not one in which either major political party made an official endorsement. However, endorsements there were--and campaign contributions for and against the justices totalling more than eleven million dollars. A wide variety of special interest groups--insurance companies, oil and gas interests, large corporate employers, agricultural conglomerates, prosecutors, and other law enforcement officials--poured money into the campaign coffers of the organizations formed to defeat justices who wrote or joined in opinions those groups deemed harmful to their economic or professional interests. On the other side, personal-injury and criminal-defense lawyers who agreed in general with the Court's decisions rallied to the support of the beleaguered judicial officers.
 
 
 39
 In the months preceding this nonpartisan election, the three embattled justices were forced to appear on television to plead their cases, and to seek the endorsements of powerful newspapers, bar organizations, and prominent lawyers. Most important, however, the justices were compelled to seek large amounts of money from potential campaign contributors so that they could convey their messages to the voters. True, they could have kept silent--but if the people of the state want elections for judges, they must also want a fair and full debate on the issues; and a fair and full statewide debate these days costs many millions--at least if, as was the fact in the 1986 California election, the opponents of incumbent judges conduct a full-scale, paid media campaign with thirty-second spots designed to inflame the passions and prejudices of the voters. Statistics from other states suggest that California's experience in the 1986 race was not unique. Seven million dollars was spent in Ohio's nonpartisan elections for the state Supreme Court that same year. Even back in 1980, three open seats on the Texas Supreme Court generated campaign expenses of nearly two million dollars. Uelman, California Judicial Retention Elections, 28 Santa Clara L.Rev. 333, 348 n. 44 (1988).
 
 
 40
 Money is no less important in the case of California's trial-court judges; a survey conducted by the California Judges' Association is informative in this connection. One judge who responded to the survey wrote, "[M]y 'reasons for winning' ... are as follows: (1) Money; (2) Organization; (3) An early start; (4) Money; (5) An 'excellent' candidate; (6) A weak opponent; (7) Excellent public relations and use of media advice; (8) Money; (9) Luck." Schotland, Elective Judges' Campaign Financing: Are State Judges' Robes the Emperor's Clothes of American Democracy? 2 J.L. & Pol. 57, 155 (1985) (emphasis in original). This dependence on contributors may actually affect a trial-court judge more significantly than an appellate judge, since a large portion of the necessary money is contributed by lawyers who may then or later (or indeed, regularly) have cases pending in the candidate's court.[9]
 
 C
 
 41
 In light of the above, the California provision prohibiting endorsements by political parties appears to be a particularly peculiar way of addressing the problem of maintaining judicial independence. Obviously, the dependence of judges on campaign contributions represents a far greater threat to the integrity of California's judiciary than does the possibility that some judicial candidates may be endorsed by political party organizations. Yet the state has not regulated the solicitation of campaign funds by incumbent or would-be judges, even though, as Chief Judge Goodwin points out in the majority opinion, the financial influences condoned by the state of California are not entitled to as much protection under the Constitution as the core political expression the state seeks to suppress. See FEC v. Massachusetts Citizens for Life, 479 U.S. 238, 257-59, 107 S.Ct. 616, 627-29, 93 L.Ed.2d 539 (1986); FEC v. National Conservative Political Action Comm., 470 U.S. 480, 497, 105 S.Ct. 1459, 1468, 84 L.Ed.2d 455 (1985). If contributions and endorsements are to be treated differently under the first amendment, one would expect the state to afford greater, not lesser, constitutional protection to the latter.
 
 
 42
 In actuality, the prohibition of endorsements appears to be counterproductive, for it increases the dependence of judicial candidates on campaign contributions. Endorsements permit the judge to get his name before the public in a favorable light at no expense to himself. Shutting off that avenue may well require him to find other means of attempting to make his name a household word in a few short months. Almost all those other means will involve the expenditure of substantial amounts of money. For example, a judge may file a candidate's statement which will be mailed to the voters by the county along with other election material, such as the statewide and local ballot arguments. The rub is that the judge must pay the cost of the mailing, Cal.Elec.Code Sec. 10012, a cost well beyond the means of most judicial officers. In the most recent election in Los Angeles County, the cost--to a candidate for the position of Superior Court judge--of distributing a biographical statement to the voters was over $62,000, and that cost was approximately fifteen percent higher than the cost at the time of the previous election only two years earlier. Campaign costs for all means of communication have escalated comparably--and rapidly--and the need for judges and would-be judges to engage in serious fund raising activities continues to grow each year.
 
 
 43
 Moreover, even if it were constitutionally permissible to ban some forms of speech in judicial campaigns, there is no warrant for singling out political endorsements. In part, this is because the political parties have as much right to make known their views regarding candidates for judicial office as do the Crime Victims for Court Reform, the Law and Order Campaign Committee, the District Attorneys' Association of California, the National Organization for Women, or the San Francisco Chronicle, all of which took official positions in California's 1986 retention election. The fact is that suppressing the views of political parties leaves the field free to special interest groups that have narrow, often single-issue agendas they wish to advance through the courts. California's endorsement ban permits those groups to promote their chosen candidates without fear of countervailing messages from broader-based political parties which tend to take a more balanced view, and which consider candidates' overall records, qualifications, and judicial philosophy. And California's choice must seem particularly irrational to anyone familiar with the regrettable propensity of those who manage judicial campaigns to pander to the voters' lack of familiarity with the processes of the law, and particularly the criminal law. Again, California's experience in 1986 provides a telling example:
 
 
 44
 [I]magine the power of the 30-second television spot: here was a stomach-turning crime, committed by a person whose humanity was cloaked in blood; here is the mother, or the grandmother, or the daughter of the victim lamenting her loss, and suggesting, or implying, that the California Supreme Court, in its unalterable opposition to the death penalty, and in defiance of the public will, had in reliance upon some unidentified technicality set the defendant loose on the streets. Of course, it was no technicality, but a matter of constitutional or statutory right, and of course the defendant was not turned loose, but returned for retrial--in fact by the time the opposition ran the principal ad I have described, the defendant in the case had already been retried, reconvicted, and sentenced to death. But try explaining all of that effectively in 30 seconds on television, or in any manner sufficient to offset the emotional impact of the opponents' appeal.
 
 
 45
 Grodin, supra note 7, at 366-67. See also Forum, The Robed Politician, L.A. Law., Mar. 1979, at 12. Given that many of the arguments befouling today's judicial campaigns are harmful to the health of the state judiciary, there is little reason to single out political endorsements, which are surely a cut above much that currently passes for "debate on public issues [that is] uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).
 
 
 46
 Finally, anyone familiar with California's judicial elections must be aware that prohibiting official party endorsements cures none of the ills cited by supporters of the ban. First, to the extent that one is concerned about the use of "litmus tests" for judicial candidates, the concern is misdirected. As I have already suggested, party organizations are far less likely to use "single-issue" determinants of judicial fitness than are many powerful interest groups that participate in election campaigns, such as the National Rifle Association, the National Abortion Rights Action League, or the Right to Life Committee. Silencing the voice of political parties serves only to increase the strength of the message being delivered by other groups with narrower or less public-spirited objectives. Under these circumstances, it could well be argued that Judge Alarcon's "frightened incumbent who has been subjected to media criticism for an unpopular decision," post, at 313, should welcome the broader perspective the political parties offer and the support their endorsements can bring.
 
 
 47
 Second, if the concern is rather that endorsements will be made on the basis of political allegiances that have nothing to do with judicial fitness, that is not an appropriate consideration on which to base a measure outlawing speech. Voters are free to accept or reject endorsements made on the basis of political beliefs, just as they are free to base their ultimate choice on their own view of the judicial candidates's political or judicial philosophy. Moreover, it is obvious that the "slate mailers" that frequently substitute for authentic endorsements have even less relation to the character or ability of the candidate. Today's judicial elections, for the trial courts at least, are marked by the widespread use of pseudo-official mailers that contain endorsements of candidates for both partisan and nonpartisan office. Republican candidates for partisan office are listed on slates addressed to Republican voters; Democratic slates contain the names of Democratic candidates and are mailed to Democratic party members. In each case, the names of the "endorsed" judicial candidates are listed as well. However, the decision as to which candidates will appear on the slate mailers is made not in a democratic manner by the members or officers of an official party organization; instead, it is made by private entrepreneurs, some of whom sell space--that is, endorsements--to the highest bidder.[10] Many of these private slate mailers, despite small print disclaimers, use the name of a political party and appear to the average voter to contain official party endorsements. If political parties were to be prohibited from making endorsements in judicial campaigns, then judicial candidates who might otherwise seek an honest endorsement from a legitimate political party might be compelled to buy spurious party endorsements--to pay thousands of dollars to be included on slate mailers sent out by private operators who may have no convictions about anything.[11] Thus, even if party endorsements are made in substantial part on the basis of political affiliations, those affiliations are likely to tell the voters more about a candidate's judicial philosophy than would the fact that he can afford to purchase a spot on one or more pseudo-official slates.
 
 III
 
 48
 The State of California cannot have it both ways. If it wants to elect its judges, it cannot deprive its citizens of a full and robust election debate. It cannot forbid speech by persons or groups who wish to make their views, support, or endorsements known. Nor can it complain if the citizens wish to make their electoral judgments based in part on recommendations made by political parties. If the people are to be given the right to choose their judges directly, they are free, rightly or wrongly, to consider the political philosophy of the candidates.[12] They are even free, rightly or wrongly, to consider how the candidates may vote on important issues of public concern, such as abortion, capital punishment, affirmative action, gun control, and religious freedom, to name just a few. One would have to be exceedingly naive not to be aware that a judge's judicial philosophy may influence his or her votes on important public issues that come before the court, particularly the state or federal supreme court. Whether a judicial candidate wishes to make his views known on those issues during the electoral process is another matter. So is the question whether it is proper for him to do so. But those are all problems inherent in California's decision to conduct judicial elections. If California wishes to elect its judges, it must allow free speech to prevail in the election process. While it is undoubtedly clear to all that California could not prohibit all endorsements in judicial elections, in this case it is equally clear that it cannot single out one form of disfavored speech and ban it.
 
 
 49
 Of course, the citizens of California have a choice. If they want their judges to be free from the need to conduct full-scale political campaigns, to solicit campaign funds, to seek endorsements from political organizations and private-interest pressure groups, and, most important of all, to be free from the need to worry about whether their decisions in pending cases will affect their chances of reelection, there are options available. California could, like the federal government, provide for the appointment of judges for life--at some or all levels of its judiciary. Or, there are other alternatives, some more in keeping with the traditional approach of most states. For example, California could provide that its judges must be elected or confirmed once, and that thereafter they would not need to stand for office again. However, it is not my function to tell California what system it should use to select its judges. There are legitimate arguments both for and against judicial elections; and various factors to be balanced--the most important being accountability, on the one hand, versus independence, on the other. In the end, however, any system must be judged in large measure by the quality of the judges it produces.
 
 
 50
 The system presently used in California has both advantages and disadvantages, as does the federal system. However, one thing is clear: Whatever California's ultimate decision, it may not call an election, judicial or nonjudicial, and silence citizens who wish to speak, individually or collectively, through a political party organization or otherwise.
 
 
 51
 RYMER, Circuit Judge, with whom ALARCON and FERNANDEZ, Circuit Judges, join, dissenting:
 
 
 52
 There is no question that political speech is at the core of the First Amendment, and is to be jealously protected. Eu v. San Francisco Democratic Cent. Comm., 489 U.S. 214, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989); Buckley v. Valeo, 424 U.S. 1, 14-15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976). "Debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution." Id. at 1, 96 S.Ct. at 612. Similarly, there is no question that all persons have the right to associate in political parties for the purpose of espousing their views. Tashjian v. Republican Party, 479 U.S. 208, 214, 107 S.Ct. 544, 548-49, 93 L.Ed.2d 514 (1986). Likewise the state's power to regulate the time, place and manner of elections does not extinguish the state's responsibility to be faithful to the First Amendment. Id. at 217, 107 S.Ct. at 550; Eu, 109 S.Ct. at 1019. I also agree that California's ban on political party endorsements, opposition and support of candidates for nonpartisan elections burdens First Amendment rights, and is subject to strict scrutiny. First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978).
 
 
 53
 However, I disagree that this case is like any other, including Eu, upon which the majority relies.[1] Article II, Sec. 6(b) of the California Constitution, which was designed to keep party politics out of elections for these nonpartisan offices, must therefore be analyzed afresh.
 
 
 54
 The restriction on party endorsements in non-party elections goes to the heart of the structure of local, educational and judicial governance, which California has determined shall be nonpartisan in form. Cal. Const. art. II, Sec. 6(a); Cal.Elec.Code Sec. 37. No one contests the constitutionality of this structure. Implementing it, the Legislature has enacted a number of statutes that insulate nonpartisan elections from the party apparatus.[2] When the California Supreme Court ruled in 1984 that existing law did not clearly prevent political parties from endorsing and supporting candidates for nonpartisan office,[3] the people adopted a constitutional amendment to make clear their intent that no political party or party central committee should endorse, support or oppose a candidate for nonpartisan office.
 
 
 55
 The question in this case is whether California has a compelling interest in the structure of its nonpartisan government, such that prohibiting political party endorsements, opposition and support of candidates for nonpartisan office is the least restrictive means by which it can be achieved.[4] The answer, I submit, requires us to consider the unique nature of this interest in our federal system, and to constrain ourselves in the interests of comity to interpret Sec. 6(b) so as to avoid unconstitutionality, if possible.
 
 
 56
 California's interest in this case is of extraordinary importance. It is rooted in the United States Constitution, which assures the citizens of each state the right to determine the structure of their own government so long as it is in a republican form.[5] Because of its constitutional underpinning, the state's interest in this case is particularly compelling. Such an interest requires a different balancing of the burdens on plaintiffs' First and Fourteenth Amendment rights, the state's justification for the burdens imposed, and the restrictiveness of the means available to accomplish the goal of preserving the nonpartisan structure of government by keeping nonpartisan offices and nonpartisan elections, nonpartisan, than either the district court or the majority has undertaken.
 
 
 57
 It is not surprising that the state's interest in the structure of its government has not been taken into account, because the City argued a different interest (avoiding corruption) in its papers. Based on the argument that was made, the district court granted summary judgment. On one view this was consistent with Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), because the City produced no evidence to show that the state's interests are endangered by party participation in nonpartisan elections or that Sec. 6(b) is the least restrictive means for serving its interests.[6] However, in light of the significance of this issue to the people of the State of California, and the overriding importance of the interest at stake, it is appropriate that the parties, and the court, have the benefit of a more searching analysis than has occurred in this case.
 
 
 58
 When, as here, both the record and the issues are inadequately developed, it is within the province of the district court to decline a summary judgment.[7] In this very special situation, I would reverse and remand to permit full consideration of the state interest I view as "super"-compelling.[8]
 
 
 59
 * A
 
 
 60
 "A Republic, madam, if we can keep it" was Benjamin Franklin's response when asked what form of government the new Constitution created. A republican government is "a government which derives all its powers directly or indirectly from the great body of the people." The Federalist No. 39, at 112 (J. Madison)(R. Fairfield ed. 1981). It is "constructed on this principle, that the supreme Power resides in the body of the people." Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 457, 1 L.Ed. 440 (1793) (opinion of Wilson, J.). As put by the Court in In re Duncan, 139 U.S. 449, 461, 11 S.Ct. 573, 577, 35 L.Ed. 219 (1891), "the distinguishing feature" of a republican form of government "is the right of the people to choose their own officers for governmental administration, and pass their own laws."[9]
 
 
 61
 Article IV, Sec. 4 of the United States Constitution declares that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government." As described by one commentator, the guarantee clause
 
 
 62
 restricts the federal government's power to interfere with the organizational structure and governmental processes chosen by a state's residents.... In order to ensure that state and local governments remain responsive to their constituents ... citizens must have the power to choose the governmental forms that work best for them. The guarantee clause, therefore, grants states control over their internal governmental machinery.
 
 
 63
 Merritt, The Guarantee Clause and State Autonomy: Federalism for a Third Century, 88 Colum.L.Rev. 1, 41 (1988).[10]
 
 
 64
 California has chosen to make its judicial, educational and municipal offices nonpartisan. The guarantee clause requires that we "respect the state's most fundamental structural choices as to how its people are to participate in their own governance." L. Tribe, American Constitutional Law 398 (2d ed.1988). Put another way, the nonpartisan form of government represents a state interest of constitutional dimension. For that reason, it must be accorded weight of the most compelling sort.
 
 B
 
 65
 The district court recognized only a "legitimate" interest in maintaining the nonpartisan character of local, judicial, and school elections. Against that level of interest the court found that Sec. 6(b) was "not a narrowly drafted enactment designed to advance such interest by the least drastic means."[11] Judge Zirpoli postulated that the state could safeguard its interests by providing for nonpartisan methods of nomination (which had already been done by statute), and by controlling partisan activities of the candidates, for example, by prohibiting candidates from soliciting or collecting campaign funds from political parties.
 
 
 66
 There are two problems with this analysis. It misapprehends the nature of the state's interest, and in so doing, undervalues it. Second, it hypothesizes less restrictive means without considering their relationship to the interest at stake or whether they work.[12]
 
 
 67
 The interest at stake is California's choice of a nonpartisan structure of government for judicial, school and municipal office. I believe it is "super"-compelling. In determining whether the limitations embodied in Sec. 6(b) sufficiently relate to that interest and are narrowly tailored to serve it, we may look to precedent,[13] determine that the answer is "inherently persuasive" or "self-evident,"[14] or base a decision on legislative findings or record evidence.[15]
 
 
 68
 The majority looks to precedent and finds Eu v. San Francisco Democratic Cent. Comm. persuasive. However, it is not possible to fit this case into that pigeonhole. Eu involved different issues and a different interest.
 
 
 69
 Eu had to do with the system by which a political party selects its own candidates for partisan office. The purpose of a primary election within this structure is to settle the differences within the party, so that the majority views of the party members are carried forward to the general election. The partisan primary election is designed to ensure that party nominations are within party lines, thus preserving the integrity of the party. In Eu we found that regulation of internal party affairs burdens the right of political parties to govern themselves as they see fit, because a partisan primary is by definition theirs.
 
 
 70
 By the same token, a nonpartisan election is by definition not theirs. The purpose of an election within the nonpartisan structure has nothing to do with settling the internal divisions within a political party. Rather, a nonpartisan structure abandons the political party as a conduit for the electorate's views. Nonpartisanship envisions "direct representation of citizens rather than indirect representation through parties as intermediaries." Note, Local Nonpartisan Elections, Political Parties and the First Amendment, 87 Colum.L.Rev. 1677, 1679 (1987).
 
 
 71
 The interest asserted by the state was quite different as well: protecting political parties from disruption that might result if they were to make preprimary endorsements. "This interference with the parties' and their members' First Amendment rights was not justified by a compelling state interest for a State has a legitimate interest 'in orderly elections, not orderly parties.' " Eu, 109 S.Ct. at 1019 (quoting our opinion, 826 F.2d at 831).
 
 
 72
 The district court, on the other hand, recognized that Eu was not dispositive[16] but it proceeded by way of assumption, and was also apparently of the view that the issue was self-evident because it granted summary judgment without a record. Much as I respect Judge Zirpoli, I do not think the result in this case is self-evident. If, however, my only option were to decide what is self-evident, I would say that nonpartisan means no party and there is accordingly no less restrictive means of filling a no-party office, than a no party election. But I believe reasonable judges can reasonably differ on a sensitive issue such as this. It is therefore unsatisfactory that we should indulge our own instincts or experience.
 
 
 73
 There is a framework within which an objective analysis could be conducted that would be commensurate with the importance of this case. A logical starting point is how the Legislature has filled out the skeleton of the state's nonpartisan structure for judicial, school and municipal government. A "partisan office" means "an office for which a party may nominate a candidate," while a nonpartisan office is one whose holders have not been nominated in a partisan primary or identified on the ballot as affiliated with a political party, and who have not been elected on a partisan ballot.[17] In 1986 the people of the state amended Section 6 of the California Constitution to reaffirm that "[a]ll judicial, school, county, and city offices shall be nonpartisan" (Sec. 6(a)) and to provide that "[n]o political party[18] or party central committee may endorse, support, or oppose a candidate for nonpartisan office" (Sec. 6(b)).[19] This was done to continue a "long-understood ban on partisan electioneering in local and judicial elections"[20] which the California Supreme Court had concluded was not enforceable under the Constitution or statutes as then drafted.
 
 
 74
 Next, it makes sense to assess the burden Sec. 6(b) imposes on political parties.[21] It does not prevent individuals or groups of individuals (such as the California Democratic Council or "Democrats for Bradley") from making endorsements. Nor does it preclude political parties from speaking out on issues. For example, the Republican Party could support the building of a jail in Fresno and the Democratic Party could oppose it, even though candidate A for mayor was for the building of the jail and candidate B was against it. Narrowly construed, Sec. 6(b) does not inhibit a political party from calling attention to a candidate's record and experience and qualifications. Further, the identification of candidates with particular parties plays much less of a role in the nurturing of an informed electorate for local, school and judicial offices, than for national (or state) elections.[22] To the extent that the natural focus of a ballot-qualified party is on issues of broad application and on partisan offices such as the Presidency, the Congress, or the Governorship, party labels provide scarcely any "shorthand designation of the views of party candidates on matters of public concern" in connection with nonpartisan, specialized local elections.[23] This is especially so since candidates for nonpartisan office neither run as a party member, nor are labelled as such on the ballot.[24]
 
 
 75
 These factors should then be considered in light of the "super"-compelling importance of the state's interest in its chosen form of government, to determine if Sec. 6(b) is narrowly tailored, whether there are less restrictive means that serve that interest, and whether alternatives work. The majority concludes that "the mere fact that Sec. 6(b) targets the collective rather than the individual voices of party members does not suffice to render it 'precisely drawn.' "[25] I agree.[26] But the fact that it targets the collective voice only with respect to endorsements for nonpartisan offices may render it drawn as precisely as it can be,[27] for to preclude party endorsements in nonparty elections is the flip side of a candidate's running for nonpartisan office without party identification. It also conforms exactly to the California Election Code's definition of partisan office as one "for which a party may nominate a candidate,"[28] and conversely to that of a nonpartisan office, for which a party may not nominate a candidate.
 
 
 76
 The "less drastic" possibilities posited by the district court (and adopted by the majority) may be links in the chain, but cannot serve the state's structural interest if there is any missing link. For example, Judge Zirpoli suggested that nonpartisan methods of nomination would be less restrictive. Clearly these serve the applicable interest. However, if nonpartisan methods of nomination were not supplemented by prohibiting party endorsements, the track to nonpartisan office would be virtually indistinguishable from the track to partisan office. Candidates are nominated for nonpartisan office by petition which may not disclose their party affiliation; those for partisan offices are nominated through partisan primaries. There would thus be no material difference between a nonpartisan method of nomination, with party endorsements as Judge Zirpoli suggests, and a partisan method of election.[29] Therefore it does not appear that the means of relying entirely on nonpartisan nomination methods, without the limitation in Sec. 6(b), would work.[30] The district court's other suggestion, prohibiting candidates from soliciting or collecting campaign funds from political parties, might serve the state's interest in corruption, but would only incidentally advance its interest in structure.[31]
 
 
 77
 Because the district court was considering corruption, it measured neither alternative against a structural interest that is "super"-compelling. While these or other means might work, there is no basis in the record for reaching a reasoned conclusion that they will or won't.
 
 
 78
 Instead, the final step in the analysis ought to be whether the state's interest in the nonpartisan structure of government, constitutionally recognized in the guarantee clause, warrants a burden of the sort imposed on the First and Fourteenth Amendment rights of a political party. Both the Congress and the Supreme Court have acknowledged that there is a difference of constitutional dimension between political activity by political parties and political activities of other organizations or individual political actors. In Civil Serv. Comm'n v. Letter Carriers, 413 U.S. 548, 565, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973), the Supreme Court upheld the Hatch Act, which prohibited federal employees from involvement in political activity, against a First Amendment challenge. In so doing, it emphasized the right of government employees to be involved with everything except political parties.
 
 
 79
 Conversely there is nothing about the state's interest in the nonpartisan form of its local, school and judicial government that implicates the rights of anyone but a ballot-qualified political party from endorsing, opposing or supporting candidates for nonpartisan office. The same goes for the rights of a political party to espouse views on controversial issues, even when those views correspond to views held by a particular candidate.[32]
 
 
 80
 It was clear to the Court in Letter Carriers that the danger to proper government functioning presented by political party involvement was different in kind from the danger presented by the involvement of other organizations, ideas, considerations, or even by political actors of an independent stripe. In other words, in the political context nonpartisanship does not mean that an officeholder adheres to no causes or factions, or even that the officeholder is not committed to the tenets or goals of a political party. It does mean that there should not be activity that gives (or seems to give) a party any power whatever over the holder of a nonpartisan office.
 
 
 81
 Accordingly, there is no reason inhering in the state's interest in the structure of its government that inhibits California from justifying its restriction on endorsements in this case.
 
 II
 
 82
 Because the state's interest in the structure of nonpartisan government is so compelling, I do not believe it is necessary to reach the corruption issue. The majority does, but its approach is flawed in a way that affects its analysis of the state's justification for Sec. 6(b). The majority focuses solely on financial corruption of the sort addressed in Buckley, FEC v. National Conservative Political Action Comm., 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985), and Austin v. Michigan Chamber of Commerce, --- U.S. ----, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), and purports to distinguish the kind of corruption "decried" by California in this case.[33] However it is clear that corruption can occur from political as well as financial debt. See, e.g., Letter Carriers, 413 U.S. at 565, 93 S.Ct. at 2890 (partisan political activities by government employees poses danger to "fair and effective government"); Bellotti, 435 U.S. at 788 n. 26, 98 S.Ct. at 1422 n. 26 (importance of government interest in preventing corruption of elected representatives through creation of political debts "has never been doubted"); Buckley, 424 U.S. at 26-27, 96 S.Ct. at 638. Letter Carriers is closely on point, implicitly recognizing that partisan politics may have a corrupting influence on a system designed to be nonpartisan.[34] The interest California actually asserted in this case is not that endorsement by a political party corrupts the voter by influencing him or her to cast a ballot one way or the other;[35] rather, it is that endorsement corrupts the nonpartisan candidate and officeholder in the performance of his duties.[36] Along with the state's interest in preventing corruption of that sort, "[p]reservation of the individual citizen's confidence in government is equally important." Bellotti, 435 U.S. at 789, 98 S.Ct. at 1422.
 
 
 83
 Even if a limitation on speech does keep information from the voters, Buckley teaches that it is permissible if there is a compelling state interest balanced against a marginal burden on First Amendment rights. Applying Buckley to Sec. 6(b) suggests that endorsements are more analogous to large campaign contributions than to independent expenditures; unlike independent campaign expenditures, endorsements are prearranged and coordinated.[37] Unlike a contribution, however, endorsement itself creates the corruption, not the amount of endorsement. The state therefore has a justification for banning endorsements that neither the district court nor the majority recognizes.
 
 
 84
 The majority also relies on Austin in concluding that the kind of corruption at issue here is different from that reached elsewhere. While the relevance of Austin to this case is by no means clear, it is not unambiguous. However tempting it may be to whitewash its holding or pick and choose what it says, the Court can fairly be read to suggest that the state's interest in avoiding corruption is reasonably furthered by restricting speech, in the form of expenditures, by organizations which have amassed political "war chests" with the aid of legal advantages conferred by the state. As ballot-qualified parties have that status by virtue of statute in California, it could be said that they, too, have amassed their clout with the aid of legal advantages conferred by the state such that, in the context of a nonpartisan election, their "war chest" would have a correspondingly corrosive effect.[38]
 
 III
 
 85
 We have an obligation to construe any law, if fairly possible, to avoid raising doubts of its constitutionality. New York v. Ferber, 458 U.S. 747, 769-70, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982); Letter Carriers, 413 U.S. at 571, 93 S.Ct. at 2892. However, neither the district court nor the majority tries to do so.
 
 
 86
 The issue in this case is whether the City of San Francisco erred in not permitting party endorsements to appear on the official San Francisco Voter Pamphlet, in reliance on Sec. 6(b). It is not necessary to construe Sec. 6(b) as the majority does, as "impos[ing] a total ban on any partisan gesture of support for or opposition to a candidate."[39]
 
 
 87
 Not even plaintiffs assert that the ban encompasses "any partisan gesture of support." Plainly it does not: parties are free to speak out on issues and relate those issues to a candidate; partisan sub-groups are free to do anything they want in as partisan a way as they choose.
 
 
 88
 More significantly, Sec. 6(b) can be construed to prohibit only endorsements, and not to extend to communications about the candidates' qualifications, position on the issues, experience or platform. It can also be construed as applying only to public endorsements, or endorsements on the official voter information pamphlet. In any event it could be construed not to apply to recommendations made to members. See, e.g., United States v. CIO, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948) (declining to construe Sec. 313 of the Corrupt Practices Act to prohibit corporations and unions from expressing views on candidates directly to members). To the extent Sec. 6(b) provides that a political party may not "support or oppose" a candidate for nonpartisan office, it may be too vague or too encompassing to be enforced. If excision of those terms will narrow the statute so that it can be constitutional, the necessary surgery should be performed.[40] Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985).
 
 IV
 
 89
 It is particularly troubling in this case that there is virtually no record.[41] There is, for example, no evidence showing whether the relative voice of political parties has been unduly significant or influential in nonpartisan elections where endorsements have occurred. Nor is there any evidence bearing on feasibility of alternate means to aid the state's interest. The absence of a record leads inexorably to judges judging on their own instinct or experience.
 
 
 90
 This case presents an issue of fundamental importance to the State of California, and concerns an interest of the people that lies within the heartland of the Constitution. That being so, we should not conclude that California's concern is not compelling enough, without searching inquiry and an adequate record.
 
 I would, therefore, reverse and remand.[42]
 ALARCON, Circuit Judge, dissenting:
 
 91
 I respectfully dissent from the majority's opinion. I concur in Judge Rymer's conclusion that the State of California has a compelling interest in maintaining the nonpartisan structure of local, judicial, and school elections that is protected by the guarantee clause. I write separately because it is my view that the district court and the majority have failed to consider properly the evidence in the record and the lessons of California's history regarding the devastating impact that party endorsement can have on the integrity of local office holders and on the independence of its judiciary.[1]
 
 
 92
 California judges, unlike the members of this court, are not appointed for life. California trial judges must run for reelection every six years against any opponent who has practiced law for the minimum number of years and has not been convicted of a crime. Cal. Const. art. VI, Sec. 16(b), (c) (West Supp.1990). Its appellate judges must run on their record in an uncontested election every 12 years. Id. Sec. 16(a), (d). By adopting subsection (b) of article II, section 6 of its constitution, California has wisely chosen to prevent political parties from imposing on candidates for judicial office "litmus tests" of their views on contemporary social and political issues as the price of a partisan endorsement.
 
 
 93
 California adopted nonpartisan elections to end political control of local, school, and judicial offices by greedy and unscrupulous party officials and morally corrupt public officeholders. The majority's holding will dismantle the structure erected by California citizens to provide them with local officials who have not compromised their views or made improper commitments to gain party endorsement and win an election.
 
 
 94
 * CALIFORNIA'S POLITICAL PAST: A CORRUPT BEGINNING
 
 
 95
 The philosopher, George Santayana, warned us that "[t]hose who cannot remember the past are condemned to repeat it." G. Santayana, 1 The Life of Reason 2284 (1905). The voters adopted subsection (b) on June 3, 1986 because they wanted to avoid a repetition of the pervasive corruption of public officials that existed in California prior to the political reformation that began in 1911 under the leadership of Hiram Johnson.
 
 
 96
 In the latter part of the nineteenth century, the founders of the Southern Pacific Railroad, Collis P. Huntington, Leland Stanford, Charles Crocker, and Mark Hopkins, known as the "Big Four," dominated California politics. California Politics and Policies 4 (E. Dvorin & A. Misner eds. 1966) [hereinafter California Politics ]. "[T]here was hardly an office, from the seats in the United States Senate down through the governorship and the courts to the most inconsiderable town office, in which the right man could not do the railroad a service." J. Caughey & N. Hundley, California: History of a Remarkable State 281 (4th ed. 1982) [hereinafter J. Caughey]. Illustrative of the arrogant confidence of the "Big Four" regarding its political dominance is the threat made by Charles Crocker to the Los Angeles City Council: "If this be the spirit with which Los Angeles proposes to deal with the railroad upon which the town's very vitality must depend I will make grass grow in the streets of your city." California Politics, supra, at 4.
 
 
 97
 Wholesale civic corruption in San Francisco led to political reform of California's local elections. In 1901, attorney Abraham Ruef, the leader of the Union Labor Party, was successful in capturing the mayor's office for his candidate, Eugene E. Schmitz, a theatre musician. In 1905, Ruef was successful in bringing about the election of his full slate of supervisors. J. Caughey, supra, at 282. In addition, Ruef controlled the police force and the city's franchise board and "used utility rates as a means of political payoff." J. Owens, E. Costantini & L. Weschler, California Politics and Parties 33 (1970). "Ruef's machine exacted tribute from saloons, gambling houses, bordellos, French restaurants, prize fights, and the like, but its more ambitious levies were upon telephone, gas, water, and streetcar companies." J. Caughey, supra, at 282.
 
 
 98
 After the 1906 earthquake, the Ruef machine found "even greater opportunities" for graft. Id. at 283. The people of San Francisco were, as now, enchanted with their cable cars. They did not want any overhead trolleys to spoil the beauty of their city. Shortly after the earthquake, however, the Ruef machine, making use of allegations that tremors had closed the cable slots, succeeded in granting the United Railroads Company a blanket franchise to install trolley lines. Id.
 
 
 99
 The Ruef machine's political exploitation of the devastation caused by the earthquake resulted in a mass meeting called to denounce corruption in San Francisco. Id. Thereafter, District Attorney William H. Langdon announced that charges of graft and malfeasance in office would be presented to the grand jury. Id. The mayor's response to this announcement was to attempt to remove the district attorney from office and replace him with Ruef. Id. Langdon, however, obtained an injunction to prevent Ruef from taking over the prosecutor's office. Id.
 
 
 100
 During the grand jury investigation, 17 out of 18 supervisors testified that they had taken bribes. Id. at 284. The grand jury returned 70 indictments against Ruef. Id. at 283-84. During one of the trials against Ruef, Francis J. Heney, the chief prosecutor, was shot down in open court by a juror. Id. at 284. His assailant was found dead in his cell. Id. Hiram W. Johnson, a successful San Francisco attorney, volunteered to step in and take over the prosecution of Ruef. Id. Ruef was convicted and sentenced to 14 years in prison. Id.
 
 
 101
 Meanwhile, appalled by the manipulation of the 1906 Republican State Convention by the Southern Pacific Railroad's political henchmen, newspaper editors and publishers advocated the adoption of a direct primary system in California to permit the membership of each party to have a voice in the selection of its candidates. California Politics, supra, at 24-25. In the 1908 election, an overwhelming majority of voters voted to adopt an amendment to the California Constitution to institute a direct primary system. B. Hyink, S. Brown, & E. Thacker, Politics and Government in California 25 (10th ed. 1979) [hereinafter B. Hyink].
 
 
 102
 Hiram W. Johnson was nominated as a reform candidate for governor in the 1910 Republican primary. Johnson promised to "kick the Southern Pacific Railroad out of the Republican Party and out of state government." J. Caughey, supra, at 288. Johnson won the Republican nomination by defeating four candidates, including a candidate endorsed by the railroad. B. Hyink, supra, at 25. In 1911, Governor Hiram Johnson embarked on a program of legislative reform that included statutes that, by 1913, succeeded in effectively barring political parties from participation in the nomination process for nonpartisan candidates. See Unger v. Superior Court, 37 Cal.3d 612, 617, 692 P.2d 238, 241, 209 Cal.Rptr. 474, 477 (1984) (Unger II ). The reform of California politics begun under Governor Johnson in 1911, including the elimination of judicial and local offices from party control, was described by Theodore Roosevelt as "the most comprehensive program of constructive legislation ever passed at a single session of an American legislature." J. Caughey, supra, at 289. The language of article II, section 6(a) of the California Constitution, adopted in 1972, is the embodiment of Governor Johnson's reforms. It provides: "Judicial, school, county, and city offices shall be nonpartisan." Cal. Const. art. II, Sec. 6(a).
 
 II
 
 103
 ENDORSEMENTS IN NONPARTISAN ELECTIONS EXPRESSLY EXCLUDED
 
 
 104
 Sixty-eight years after Johnson began his crusade of political reform, the Marin County Democratic Central Committee attempted to involve itself in a nonpartisan election. On or about September 1, 1979, the Marin County Democratic Central Committee "invited all registered Democrats who were candidates for the governing board of the district to attend a September 6, 1979, meeting of the County Central Committee to seek the endorsement of the County Central Committee and to apply for financial assistance." Unger v. Superior Court, 102 Cal.App.3d 681, 683, 162 Cal.Rptr. 611, 612 (1980) (Unger I ) (emphasis added), cert. denied, 449 U.S. 1131, 101 S.Ct. 952, 67 L.Ed.2d 118 (1981). The Marin County Democratic Committee publicly endorsed four candidates. Id., 162 Cal.Rptr. at 612.
 
 
 105
 Samuel Unger, a candidate for election as a member of the governing board of the Marin County Community College District, did not attend the meeting or seek endorsement. Instead, he filed a petition in the Superior Court of Marin County, seeking to enjoin the County Central Committee from endorsing or supporting candidates for nonpartisan office. Id. Unger argued that the County Central Committee's endorsement violated article II, section 6 of the California Constitution and section 37 of the Elections Code. Section 37 provides: " 'Nonpartisan office' means an office for which no party may nominate a candidate. Judicial, school, county and municipal offices are nonpartisan offices." The Superior Court of Marin County denied the petition without leave to amend and ordered the action dismissed. Id. at 684, 162 Cal.Rptr. at 612.
 
 
 106
 The California Court of Appeal for the First District, Division Two, concluded in Unger I that,
 
 
 107
 the explicit and unqualified language of Article II, section 6 prohibits a political party and, in particular, a county central committee of a political party, from endorsing, supporting, or opposing a candidate for the office of governing members of the board of a community college district, a nonpartisan school office within the meaning of the constitutional provision, in any election.
 
 
 108
 Id. at 686, 162 Cal.Rptr. at 613-14. On May 22, 1980, the California Supreme Court denied an application for a hearing of Unger I. Justices Stanley Mosk and Frank Newman voted to grant the application.
 
 
 109
 On March 9, 1982, Samuel Unger and others filed a petition in the Superior Court of San Francisco seeking to restrain the Republican Party of California from recommending a negative vote in a retention election regarding three justices of the California Supreme Court. Only three of the seven members of the California Supreme Court sat on this matter. Four retired members of the California Courts of Appeal[2] were assigned to hear this appeal. Justice Mosk, joined by Justice Files and Justice Janes, concluded that article II, section 6 did not prohibit a political party from endorsing, supporting, or opposing candidates for a nonpartisan office. Unger II, 37 Cal.3d at 620, 692 P.2d at 243, 209 Cal.Rptr. at 479. Justice Mosk, however, did not purport to discuss the propriety or wisdom of a law that would bar endorsements on nonpartisan elections: "Our conclusion in this case is reached without consideration of policy questions. We are not unmindful of the persuasive reasons why it is preferable for political parties to refrain from endorsing or opposing nonpartisan candidates. However, that is a matter for consideration by the Legislature; it, not the judiciary, is the proper body to impose regulations in the conduct of political parties." Id., 692 P.2d at 243-44, 209 Cal.Rptr. at 479-80 (emphasis added).
 
 
 110
 Justice Malcolm Lucas filed a concurring opinion in which he stated as follows:
 
 
 111
 I concur, albeit reluctantly, in the majority opinion. My agreement stems from my conclusion that Justice Mosk has correctly interpreted the scope of the existing restrictions imposed by the Legislature and the California Constitution. My reluctance flows from my concern about the effect of our ruling in light of important social and political policy considerations expressed by Justice Sims in his dissent. I think there is a strong state interest in preserving the nonpartisan nature of the offices involved and that this interest will be sorely tried if political parties engage in wholesale endorsement of and opposition to candidates for "judicial, school, county, and city offices ...." (Cal. Const. art. II, Sec. 6.)
 
 
 112
 Because this interest is so important, I cannot join in Justice Grodin's approach. His conclusion that the First Amendment may well bar restrictions on political endorsements of candidates for nonpartisan office is premature. The Legislature may be able to fashion a permissible limitation on partisan involvement in nonpartisan campaigns after careful scrutiny of the various interests at stake. I do not think that at this stage we should sweepingly discourage such an attempt. The majority opinion, of course, does not take that path.
 
 
 113
 Id. at 625, 692 P.2d at 247, 209 Cal.Rptr. at 483 (Lucas, J., concurring) (emphasis added).
 
 
 114
 Justice Joseph Grodin filed a concurring opinion in which he commented that if article II, section 6 had been construed by the majority to bar a political party from endorsing, supporting, or opposing a candidate for nonpartisan office, the statute would violate the first amendment to the United States Constitution. Id. at 621, 692 P.2d at 244, 209 Cal.Rptr. at 480 (Grodin, J., concurring). Retired Courts of Appeal Justice Sims concurred in the order of the court discharging the writ as moot. Justice Sims, joined by Justice Potter, expressed the view that "the state, in pursuit of the laudable aim of freeing judicial offices from partisan consideration has properly served a compelling interest by limiting the elections in which the statutorily created party may officially participate." Id. at 626, 692 P.2d at 247, 209 Cal.Rptr. at 483 (Sims, J., concurring) (emphasis added).
 
 
 115
 It is clear from the majority opinion and the observations of Justices Lucas and Sims that six members of the seven-person panel were of the view that there are "persuasive reasons why it is preferable for political parties to refrain from endorsing or opposing nonpartisan candidates." Unger II, 37 Cal.3d at 620, 692 P.2d at 243-44, 209 Cal.Rptr. at 479-80. The factual justification for precluding party endorsement was not set forth in Justice Mosk's opinion. The sordid background of party control and corruption of judicial and local offices was eloquently set forth, however, in Justice Sims' concurring opinion. Id. at 631, 692 P.2d at 251, 209 Cal.Rptr. at 487 (Sims, J., concurring). Thus, six out of seven members of the Unger II court appear to have been persuaded that a compelling interest still existed in 1984 that would support a law in California barring official endorsement or opposition by political parties.
 
 
 116
 In response to the majority's interpretation of California's article II, section 6 in Unger II as not expressly precluding party endorsement or opposition in a nonpartisan election, Assemblyman Richard Mountjoy introduced Assembly Constitutional Amendment 7 to add subsection (b) to article II, section 6. California voters adopted subsection (b) by a vote of 2,292,678 to 1,805,305 on June 3, 1986. Thus, the reformation of California law to protect the independence of the judiciary and remove local offices from the control of political parties, which began in 1911, was completed 75 years later. In 1986, a majority of Californians approved an initiative that expressly spelled out that the political reforms inspired by Hiram Johnson's populist political revolution cannot be fulfilled if party endorsement or opposition of nonpartisan candidates for judicial and local office is tolerated.[3]
 
 III
 INDEPENDENCE OF THE JUDICIARY:
 A COMPELLING CALIFORNIA IMPERATIVE
 
 117
 California's determination to eliminate political party domination of judicial and local office holders because of its sad experiences with the impact of party influence on the integrity and independence of elected officials led inexorably to the adoption of subsection (b). As noted by Judge Trott in the majority opinion in Geary v. Renne, 880 F.2d 1062 (9th Cir.1989), reh'g granted en banc, 895 F.2d 1230 (9th Cir.1990), this court should not ignore "the importance of considering a law in the context of the historical circumstances that gave rise to it." Id. at 1073.
 
 
 118
 The majority has failed to consider or discuss the devastating effect that California's political parties had on the integrity and independence of its judges and local office holders as the result of payoffs, graft, and corruption. This sordid record inspired the populist revolution against the corrupt domination by political parties over the daily lives of California's citizens. I believe that California's voters have applied inspired logic to eliminate the evils brought about by party control of judicial and local office elections, by enacting legislation to make these offices nonpartisan. I agree with my colleagues that subsection (b) places a burden on first amendment rights requiring strict scrutiny to determine whether the state has demonstrated that this restriction on protected activity is supported by a compelling state interest. Majority op. at 283 (citing Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 109 S.Ct. 1013, 1019-20, 103 L.Ed.2d 271 (1989)). None of the cases cited by the majority, however, analyzes the question whether a state may burden first amendment rights by precluding party endorsements in nonpartisan elections.
 
 
 119
 In this case, the record amply demonstrates that subsection (b) is necessary to meet California's compelling interest in maintaining the independence of the judiciary. Regrettably, the majority makes no reference to the compelling and uncontradicted testimony presented to the district court by former Associate Justice Winslow Christian. Justice Christian clearly qualifies as an expert on the potentially devastating impact of politics on judicial independence in California. Justice Christian served as a trial judge in Sierra County for four years. He was an associate justice of the California Courts of Appeal for 17 years. He was also the Executive Director of the National Center for State Courts for several years. Justice Christian testified that this position enabled him to study the judicial selection and tenure systems in many states. He also "learned that in certain states partisanship in judicial elections has damaged the reputation of the judiciary." Justice Christian declared:
 
 
 120
 [ ] The state of California has a compelling interest in the independence and integrity of its judiciary. Even the mere appearance of improper influence over members of the judiciary erodes the public's confidence in its officials and institutions.
 
 
 121
 [ ] In my opinion, the independence of the California judiciary which is subject to election or public confirmation has depended upon the nonpartisan nature of judicial elections. Permitting partisanship in the process of nominating, selecting and retaining judges would force judges to seek party endorsements. This process would create a risk of judicial candidates being tempted to promise to take party positions on legal issues which are pending or likely to arise. This harmful feature of partisanship in judicial elections has damaged the reputation of the judicial systems of certain other states known to me. The mere possibility of such political "deals" would undermine public confidence in the administration of justice.
 
 
 122
 [ ] Endorsements of judicial candidates by political parties differs from endorsements by other groups or individuals because political party endorsements tend to call for commitments on political and social issues conflicting with the overriding commitment a judge should hold to ... fair and unbiased administration of justice.
 
 
 123
 [ ] In my opinion, therefore, partisan endorsements in nonpartisan judicial elections undermine the state's compelling interest in the independence and integrity of its judiciary.
 
 
 124
 By voicing his concern that a political party would expect a judicial candidate to adopt its platform on controversial issues that are likely to come before the court, Justice Christian sharply focuses on the clearest threat to the independence of the judiciary presented by permitting political parties to endorse or oppose a candidate for a nonpartisan office. As illustrated by the letter sent to candidates for a nonpartisan office in Unger I, 102 Cal.App.3d at 683, 162 Cal.Rptr. at 612, political parties are interested in learning whether those persons soliciting their endorsement and financial support are loyal and registered members of their political organizations and whether they hold views that are faithful to their platforms.
 
 
 125
 The 1990 California Democratic Party platform contains the following positions on issues important to that political group:
 
 
 126
 The Agricultural Labor Board, which held such promise for often exploited farm workers, has suffered from appointees and policies hostile to the interests of farm workers....
 
 
 127
 There should be an immediate halt to off-shore oil development....
 
 
 128
 We call for a halt to the production, use, and development of nuclear power until safe methods of mining, transport, and disposal of nuclear waste are available....
 
 
 129
 We must eliminate the use of pesticides and other agricultural chemicals found to be harmful to humans, the environment or food production....
 
 
 130
 Students with limited English proficiency must have every opportunity to learn English through strong bilingual education....
 
 
 131
 Race has been found to influence the likelihood that a person charged with capital murder will receive the death sentence, with minorities more likely to face execution and longer sentences....
 
 
 132
 The California Democratic Party believes that reproductive freedom of choice is every woman's fundamental right and that such a decision is private....
 
 
 133
 We pledge to actively oppose efforts to further erode the application of the 1973 Roe v. Wade Supreme Court decision on abortion rights.
 
 
 134
 In view of the 1986 United States Supreme Court decision in Bowers v. Hardwick [ ], the California Democratic Party supports the repeal of all laws that criminalize private sexual conduct between consenting adults.
 
 
 135
 California Democratic Party 1990 Platform 5, 7, 8, 12, 17, 19, 21 (Democratic State Cent.Comm.1990).
 
 
 136
 The most recent California Republican Party Platform was adopted in 1988. It includes the following issues in its listing of the Republican Party's highest priorities:
 
 
 137
 The Republican Party steadfastly opposes the unwarranted grape boycott....
 
 
 138
 A new chairperson, general counsel, and majority have been appointed to the Agricultural Relations Board to provide fairness and balance for farmers as well as farm workers....
 
 
 139
 The health and welfare of the worker, grower and consumer are uppermost in the minds of California agricultural officials when dealing with pesticides....
 
 
 140
 Governor Deukmejian and the Republican Party fully support implementation of the death penalty....
 
 
 141
 The Republican Party supports reasonable limits on the growth of state welfare expenditures....
 
 
 142
 The more state government taxes, spends, borrows and regulates, the less room there is for the private sector to grow. Unlike the Democrat Party, Republicans believe in a limited government, which taxes and spends only what is necessary to provide essential state services....
 
 
 143
 The Republican Party believes that all laws, practices and customs that constrain or otherwise adversely influence qualified people's movement between education and jobs, free choice of occupation and disincentives to seeking gainful employment should be removed....
 
 
 144
 1988 California Republican Party Platform 2, 4, 9, 12 (California Republican Party 1988).
 
 
 145
 Before making an endorsement or offering financial assistance, it is reasonable to assume that a political party will conduct an inquiry to ascertain whether the views of the candidate are consistent with the party's political stand. It is self-evident that a political party would not endorse or spend money to support a person whose views are antagonistic to its platform.
 
 
 146
 Almost every contemporary social issue from abortion to vivisection can result in a lawsuit seeking a declaration by a judge on the merits of the controversy. What kinds of questions might be posed to the judicial candidate seeking endorsement or financial support of his political party? Candidates in recent California elections have been asked for their views by political reporters on the following contemporary and social issues:
 
 
 147
 1. Do you believe that the death penalty violates the eighth amendment's prohibition against cruel and unusual punishment?
 
 
 148
 2. Do you agree with the five-person majority in the Supreme Court that the first amendment protects burners of the American flag?
 
 
 149
 3. Do you believe that a pregnant woman has the unrestricted right to choose whether she will have an abortion for gender preference purposes?
 
 
 150
 4. Do you believe that the federal Constitution authorizes a state governor to make political appointments based solely on a quota system without regard to merit? For example, should women be selected to fill all job vacancies until they comprise 50% of our state government's work force?
 
 
 151
 5. Do you believe that blacks should be given preference over white applicants, without proof that an employer discriminated, to make up for the fact that slavery was protected by law, and racist practices have denied blacks equal rights in this country?
 
 
 152
 6. Should oil drilling be permitted off California's beautiful coastline?
 
 
 153
 7. Should our environmental protection laws be interpreted so as to protect spotted owls and old trees notwithstanding the fact that thousands of jobs will be lost?
 
 
 154
 8. Do you believe that we should concentrate our tax dollars on treating and rehabilitating addicts instead of building more prisons to lock up narcotics offenders for long prison terms?
 
 
 155
 9. Do you believe that handgun control laws are in conflict with our rights under the second amendment?
 
 
 156
 10. Do you believe that state laws restricting the type of jobs that can be performed by AIDS patients violate the federal Constitution?
 
 
 157
 11. Do you believe in decriminalization of the use and possession of drugs?
 
 
 158
 12. Do you believe that illegal aliens should be denied welfare benefits?
 
 
 159
 13. Do you believe that all drunk drivers, including first offenders, should be imprisoned, instead of receiving fines or probation, because they are all potential killers?
 
 
 160
 14. Do you believe that all juvenile gang members, regardless of their age, should be sentenced as adults so as to deter gang membership?
 
 
 161
 15. Do you believe our no-fault divorce laws have resulted in forcing women with children into poverty while former husbands continue to maintain their lifestyles, especially upon remarriage?
 
 
 162
 16. Do you believe it is appropriate for a judge to give a defendant less punishment than he deserves in exchange for a plea of guilty?
 
 
 163
 17. Do you believe it is appropriate for judges to order local officials to change the size or shape of electoral district boundaries so as to ensure the election of a member of a minority?
 
 
 164
 18. Do you believe that rent control laws force private citizens to subsidize low-cost housing?
 
 
 165
 19. Do you favor consolidating school districts such as Beverly Hills, Santa Monica, and Los Angeles to achieve integration and avoid mandatory busing?
 
 
 166
 20. Would you uphold the constitutionality of a statute that required all able-bodied persons to work on a public project in exchange for welfare benefits?
 
 
 167
 21. Do you believe that all court-made rules that exclude relevant evidence in criminal cases solely because "the constable blundered" should be overturned?
 
 
 168
 22. Do you favor limiting damages in civil personal injury cases to out-of-pocket expenses such as medical bills and loss of wages in order to decrease the cost of insurance?
 
 
 169
 23. Do you believe in a free market economy or do you favor government regulation?
 
 
 170
 24. Do you believe that we should "soak the rich" or "reduce taxes for the wealthy to stimulate investment," or that everyone should pay approximately the same percentage of his or her income to pay for government benefits and services?
 
 
 171
 25. Do you believe that mandatory drug testing should be a condition of employment?
 
 
 172
 Without a law barring endorsement of candidates for judicial office, we can reasonably expect that curious members of screening committees will ask similar questions to test the social and political philosophy of persons soliciting party endorsement or financial support. A sturdy and resolute candidate, mindful of the canons of ethics for judicial candidates, should, of course, refuse to answer any of these questions. A frightened incumbent who has been subjected to media criticism for an unpopular decision, or a less scrupulous, politically lean and hungry[4] aspirant for judicial office might be tempted, as predicted by Justice Christian, "to promise to take party positions on legal issues which are pending or likely to arise."[5]
 
 
 173
 Because of the real possibility that candidates will have to undergo such an inquisition in pursuit of the dangling carrots of financial support and party endorsement, subsection (b) of article II, section 6 serves California's compelling interest in safeguarding the independence of its judiciary.
 
 
 174
 Justice Christian's testimony and the historical evidence of the disastrous impact on the independence of the judiciary and the integrity of local officials that resulted from party selection and endorsement was uncontroverted at these summary judgment proceedings.
 
 
 175
 The historical record shows that, while California's political parties still controlled local elections, one political leader threatened the City Council of Los Angeles with the economic destruction of the community and another bribed 17 out of 18 members of the San Francisco Board of Supervisors. The burden of showing that the citizens of California have a compelling state interest in avoiding Mephistophelean compacts[6] between political parties and nonpartisan candidates has been met by the officials of the City and County of San Francisco who are parties to this action.
 
 IV
 
 176
 SUBSECTION (B) AS THE ONLY REALISTIC SAFEGUARD OF POLITICAL
 
 INDEPENDENCE
 
 177
 Finally, subsection (b) is narrowly tailored to satisfy California's compelling interest in freedom from party influence. Applying the lessons of history and experience, the state of California has focused its restriction on the organizations central to the political influence that has caused such disruption in its past. The majority, however, claims that less drastic means could be employed to further the goals of nonpartisanship. It relies on the district court's finding that
 
 
 178
 the State could adequately safeguard the interests Sec. 6(b) was designed to protect by less drastic means, including provision for nonpartisan methods of nominating candidates for local and judicial offices and controls on partisan activities of the candidates.
 
 
 179
 Majority op. at 285.
 
 
 180
 The majority's analysis confuses preservation of the appearance of political independence with avoiding the actual lure of party influence. As Judge Rymer notes: "The 'less drastic' possibilities posited by the district court may be links in the chain, but cannot serve the state's structural interest if there is any missing link." Rymer dissent at 301 (emphasis added). Justice Christian's declaration demonstrates that party endorsement of nonpartisan candidates, in and of itself, would create a legitimate threat to the entire nonpartisan framework. The majority's proposed less drastic means are thus missing the one link that would actually shield nonpartisan candidates from party influence.
 
 
 181
 Indeed, it is hard to imagine any more narrowly drawn restriction that would adequately serve California's compelling state interest in the integrity of judges and local officials. "[A] state need not choose a rule so much less restrictive that it also is useless in achieving the state's purposes." Stevenson v. State Bd. of Elections, 794 F.2d 1176, 1180 (7th Cir.1986) (Easterbrook, J. concurring); see also Storer v. Brown, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974) ("[T]he Constitution does not require the states to choose ineffectual means to achieve its aims."). When one considers the uncontroverted reality of party power in California's history, it becomes clear that subsection (b) is narrowly drawn. As Judge Trott noted:
 
 
 182
 [Subsection (b) ] is limited in its coverage only to those concentrations of power that pose the greatest threat to the objectives of nonpartisanism. All other groups, individuals, and associations are free to do as they please. This protects the free expression and interchange of ideas that the First Amendment is designed to promote....
 
 
 183
 In addition, article II, Sec. 6(b) is not a law aimed at ideas themselves or specific information that California wishes to suppress although concededly it has this "indirect consequence." As such, it compares favorably with the statute at issue in Eu, 109 S.Ct. at 1016. It is a marginal and workable restriction on speech incident to a set of election rules designed to promote independence in public office.
 
 
 184
 Thus, section 6(b) is not the kind of substantial limitation or draconian restriction on free political exchange that rises to the level of incompatibility with the Constitution.
 
 
 185
 880 F.2d at 1080-81. Because it is the only means by which California can avoid political litmus tests for judges and local officials, and thereby ensure the independence that is the goal of nonpartisanism, I believe that subsection (b) is sufficiently narrowly tailored to survive constitutional scrutiny.
 
 
 186
 Justice Blackmun has noted that "[a] judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation." Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 188, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring). The majority offers California two watered-down and ineffective alternatives to the only practical means of ensuring political independence. I recognize California's compelling interest in avoiding party influence over nonpartisan candidates and, like Judge Trott, I "do not deem it prudent for the Federal judiciary to conclude without the benefit of the legislative process" that California can adequately safeguard its interests by other means. 880 F.2d at 1080.
 
 
 187
 I would reverse the district court's order granting summary judgment. The uncontradicted record demonstrates that California has a compelling interest in maintaining the integrity and independence of its local officials by precluding party endorsement in its nonpartisan elections.
 
 
 
 [1]
 The first amendment is made applicable to the states through the fourteenth amendment. See, e.g., NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907 n. 43, 102 S.Ct. 3409, 3422, 73 L.Ed.2d 1215 (1982); Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963)
 
 
 [2]
 In Unger, a plurality of the Court held that the state constitutional provisions making city, county, school, and judicial offices nonpartisan did not prohibit the making of endorsements by political parties. Justice Grodin wrote separately in order to express his view that a ban on such endorsements would violate the first amendment
 
 
 [3]
 In Austin, for example, the Court found the Michigan enactment at issue to be "precisely targeted" to achieve its aims because it "does not impose an absolute ban on all forms of corporate political spending but permits corporations to make independent political expenditures through separate segregated funds." 110 S.Ct. at 1398 (emphasis in original). Similarly in MCFL, the Court emphasized that the FECA limitations on corporate political expenditures upheld in its previous cases were "of course distinguishable from the complete foreclosure of any opportunity for political speech that we invalidated in the state referendum context in First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765 [98 S.Ct. 1407, 55 L.Ed.2d 707] (1978)." 479 U.S. at 259 n. 12, 107 S.Ct. at 628 n. 12 (emphasis added)
 
 
 [4]
 In fact, the California Elections Code features several provisions designed to preserve the nonpartisan character of local and judicial elections. To begin with, we note that Section 37 of the Code explicitly forbids party participation in the nomination of candidates for nonpartisan office, defining a "nonpartisan office" as "an office for which no party may nominate a candidate." In addition, the Code contains provisions stating that declarations of candidacy and other nomination papers may not refer to party affiliation (Sec. 6401.5); the name of the party to which a candidate for nonpartisan office belongs may not appear on the ballot (Sec. 10200.5); a voter may cast his ballot for a candidate for nonpartisan office without regard to party affiliation (Sec. 10214); and partisan and nonpartisan offices are to be listed in separate columns on the ballot form (Sec. 10207). See Unger, 37 Cal.3d at 616 (Grodin, J., concurring). See also Note, Local Nonpartisan Elections, Political Parties and the First Amendment, 87 Colum.L.Rev. 1677, 1698-1700 (1987) (concluding that Sec. 6(b) unconstitutionally burdens first amendment rights and discussing means short of a complete ban on political party involvement in nonpartisan elections states may employ to counteract perceived threats of undue party influence on nonpartisan officeholders and preserve responsiveness of local government to constituent concerns)
 Sec. 6(b) was enacted in 1986; appellants have made no showing that the above-mentioned Election Code provisions have proven inadequate to maintain the nonpartisan character of local and judicial offices.
 
 
 [5]
 The affidavits by various state officials offered in evidence by appellants fail to demonstrate that "the relative voice of [political parties] has been overwhelming or even significant in influencing" nonpartisan elections, "or that there has been any threat to the confidence of the citizenry" in its nonpartisan officeholders. See Bellotti, 435 U.S. at 789-90, 98 S.Ct. at 1422-23. Indeed, as Justice Grodin pointed out in Unger, "one might expect that in local elections ..., local 'special interest' and civic groups would have a greater influence over the electorate than would political parties." 37 Cal.3d at 623-24 n. 4, 209 Cal.Rptr. 474, 692 P.2d 238 (Grodin, J., concurring) (citing Lee, The Politics of Nonpartisanship 77, 79 (1960))
 Even if California is correct, and the availability of partisan endorsements in the future does produce nonpartisan officeholders more sensitized to party preferences, that result will have been effected through the exercise of informed voter choice--a mechanism with which the State may not interfere out of a concern that, in the absence of regulation, the voters will misperceive their own best interests. See Bellotti, 435 U.S. at 791 n. 31, 98 S.Ct. at 1424 n. 31 ("[g]overnment is forbidden to assume the task of ultimate judgment, lest the people lose their ability to govern themselves").
 
 
 [6]
 It is, of course, "irrelevant that the voters rather than a legislative body enacted [Sec. 6(b) ], because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." Citizens Against Rent Control v. Berkeley, 454 U.S. 290, 295, 102 S.Ct. 434, 437, 70 L.Ed.2d 492 (1981)
 
 
 [7]
 This disposition makes it unnecessary to reach appellees' equal protection claims
 
 
 [1]
 Of course, as Judge Canby pointed out in his excellent dissent from the original panel opinion, it would not "have been constitutional for California to solve the problem of Southern Pacific dominance by prohibiting the Railway from announcing its support for particular political candidates." 880 F.2d 1062, 1084 (1989)
 
 
 [2]
 In an election for partisan office, each party chooses its own nominee in a primary election in which all party members are entitled to vote. Cal.Elec.Code Sec. 6610. The candidates whose names are printed on the primary ballot must all be members of the party. Cal.Elec.Code Secs. 6401-6402. The party's nominee then contends for office in November against the nominees of the other political parties. It is possible under California law, for an independent to qualify for the general election ballot as well, Cal.Elec.Code Sec. 6800, although with one exception, a state senator from San Francisco, this provision has been of little significance in recent decades
 
 
 [3]
 It would be difficult to surpass the analysis of the free speech issue set forth in Judge Canby's dissent, 880 F.2d at 1082-86. I commend that dissent to anyone interested in the general topic
 
 
 [4]
 37 Cal.3d 612, 616, 209 Cal.Rptr. 474, 477, 692 P.2d 238, 241 (1984) (emphasis added). Dissenting in Unger, Justice Sims, sitting by designation, discounted the frequency of such partisan activity by stating that it occurred in only 25 percent of the state's counties. His use of statistics, however, was highly misleading. In the study on which Justice Sims relied, Professor Lee noted that the tendency of political parties to participate in nonpartisan elections increased with the population. According to Professor Lee's study, if the counties without significant populations are excluded, the political parties made endorsements in nonpartisan elections in roughly two-thirds of the state's counties. E. Lee, The Politics of Nonpartisanship 102-03 (1960)
 
 
 [5]
 Former court of appeal justice Winslow Christian's testimony simply presents one experienced individual's policy views on the subject of partisan endorsements in judicial elections. Certainly, those views can no more carry the day for an unconstitutional measure than can the popular vote. In any event, Mr. Christian's statement, like the rest of appellant's case, fails to offer a single fact, pro or con, relating to the making of a partisan endorsement, or its subsequent effect, in a nonpartisan race in California
 
 
 [6]
 Judge Canby has pointed out most articulately that the state's theory that it can prohibit endorsements because voters will be unduly influenced by them constitutes a classic form of state paternalism, and reflects an unwillingness to allow voters to receive information on which, the state believes, they would like to base their decisions. 880 F.2d at 1083
 
 
 [7]
 Retired California Supreme Court Justice Otto Kaus, for example, has publicly questioned whether his decisive vote to uphold California's Victim's Bill of Rights in 1982 might have been influenced by the fact that he was facing a retention election that year. Wold & Culver, The Defeat of the California Justices: The Campaign, the Electorate, and the Issue of Judicial Accountability, 70 Judicature 348, 351 (1987). Former Justice Grodin, during his retention campaign, made it his "goal to go to bed election night knowing, as best one can know such things, that I did not decide any case differently because of the election. To the best of my knowledge I achieved that goal. But I have to recognize that I may be wrong." Grodin, Judicial Elections: The California Experience, 70 Judicature 365, 367 (1987)
 
 
 [8]
 Governors are free to take positions in judicial elections, and at least some do. Governor George Deukmejian served as a vigorous public spokesman for the forces seeking to oust the incumbent Supreme Court justices in the 1986 election. When his view prevailed, he was able to appoint successors whose positions on controversial issues more closely matched his own
 Since our concern here is not with the electoral debate per se, but rather with the effect on the post-election performance of public duties, it is interesting to note that some of Governor Deukmejian's remarks in the 1986 campaign were explicitly directed toward the "correction" of what the Governor perceived as errant judicial conduct by sitting justices. Governor Deukmejian initially opposed only Chief Justice Rose Bird, and not Associate Justices Cruz Reynoso and Joseph Grodin. Toward the middle of the campaign, however, as former Justice Grodin tells us, the Governor
 declared that he would be inclined also to vote against Justice Reynoso and myself if our records in death penalty cases did not improve. Still later, in the early fall preceding the election, he announced that he did, indeed, intend to vote against the two of us as well, citing as justification that Justice Reynoso had voted only once to affirm a death penalty judgment and on only five occasions had I done so. There was no analysis of the cases, no argument that the grounds on which we had voted to reverse death penalty judgments were legally insubstantial, and no indication of how many death penalty judgments we would have to affirm to meet with Governor Deukmejian's approval.
 Grodin, supra note 7, at 367.
 
 
 [9]
 It is only natural, of course, for members of the bar to join the fray on both sides, for no one is more interested than lawyers in the question of who will decide controversial cases. Indeed, lawyers constitute the largest single group of contributors to judicial campaigns generally. The excessive judicial reliance on attorney contributions can raise troubling questions about the even-handedness of justice. See generally Note, Safeguarding the Litigant's Constitutional Right to a Fair and Impartial Forum, 86 Mich.L.Rev. 382 (1987). At least as disturbing is the role played by law enforcement organizations. Statistics from 1980 show that such organizations are at the top of the list in terms of average contributions. Dubois, Financing Trial Court Elections: Who Contributes to California Judicial Campaigns? 70 Judicature 8, 12-13 (1986). Defense counsel may well wonder whether their clients will receive a fair shake from the recipients of that largesse
 
 
 [10]
 In a primary election, both the partisan and the nonpartisan slots on slate are wide open. For some offices, the slate-mailer operator may choose candidates affiliated with his faction of the party; in other cases, the highest bidder may prevail. In the general election, the factors are different. The party's nominees for partisan office are included automatically and only endorsements of judges and other nonpartisan candidates, as well as endorsements of ballot measures are up for grabs. It is in fact the supporters or opponents of the latter who principally finance slate mailers. The official party organizations may also on occasion mail official slate mailers, but these mailers are only sporadic and generally are not distributed nearly as widely
 
 
 [11]
 Judge Alarcon's "frightened incumbent" may well not be willing to risk letting his opponent outbid him and secure the highly desirable spot on the pseudo-official slate mailer. Slate mailers are among the least expensive ways for an incumbent judge to let the voters know something about himself, not an easy task for an individual of whom the public is likely to have no prior awareness
 
 
 [12]
 That is clearly a factor normally considered by the appointing authority. More than ninety percent of all judges appointed by Democratic and Republic presidents in recent years were members of the same party as their benefactor. The same is generally true with appointments to the state courts by California governors
 
 
 [1]
 Eu had to do with whether the state could interfere with the internal processes of a party by preventing its governing body from endorsing, supporting or opposing a candidate for nomination to partisan offices in the party primary. It has nothing to do with the issue in this case, which concerns the nonpartisan structure of the judicial, municipal and educational units of government and the role of a partisan political party in nonpartisan elections for nonpartisan offices
 As Judge Norris wrote for our court in Eu, "[i]t is the right of the party, not the State, to decide how the party shall be governed." 826 F.2d 814, 827 (9th Cir.1987). The Supreme Court recognized the same point: "[a] primary is not hostile to intraparty feuds; rather it is an ideal forum in which to resolve them." 109 S.Ct. at 1022. Based on this principle it followed that the state may not enact laws " 'to prevent the parties from taking internal steps affecting their own process for the selection of candidates.' " Id. (quoting Tashjian, 479 U.S. at 224, 107 S.Ct. at 553-54) (emphasis added).
 
 
 [2]
 For example, Cal.Elec.Code Sec. 6401.5 provides that declarations of candidacy and other nomination papers for nonpartisan office may not refer to party affiliation; the name of the party to which a nonpartisan candidate belongs may not appear on the ballot (Sec. 10200.5); a voter may cast a ballot for a candidate for such an office without regard to party affiliation (Sec. 10214); and partisan and nonpartisan offices are listed in separate columns of the ballot (Sec. 10214). Political parties are also prohibited from nominating a candidate for a nonpartisan office (Sec. 36). These provisions have the effect of creating a two-track process of candidate selection and election, paralleling the structural difference between nonpartisan and partisan offices
 For a comprehensive and detailed history of these statutes and the nonpartisan structure in California see Unger v. Superior Court, 37 Cal.3d 612, 209 Cal.Rptr. 474, 692 P.2d 238 (1984), and the original panel opinion by Judge Trott in Geary v. Renne, 880 F.2d 1062 (9th Cir.1989).
 
 
 [3]
 Unger, 37 Cal.3d 612, 209 Cal.Rptr. 474, 692 P.2d 238
 
 
 [4]
 Although freedom to discuss matters of public concern is fundamental to our national heritage and the system of government ordained by our Constitution, the protection is not absolute and restraints are permitted for appropriate reasons. See, e.g., Austin v. Michigan Chamber of Commerce, --- U.S. ----, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (expenditure limitation); Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (contribution ceilings); Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (orderly elections); Munro v. Socialist Workers Party, 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986); Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (ballot access)
 5 U.S. Const. art. IV, Sec. 4.
 
 
 [6]
 The government bears the burden of showing a subordinating interest that is compelling, and of proving that a regulation is a precisely drawn means of serving its interests. Consolidated Edison Co. v. Public Serv. Comm'n, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); San Francisco County Democratic Cent. Com. v. Eu, 826 F.2d at 834. At the same time, the district court did not consider the "legislative findings" set forth in the California Ballot Pamphlet for the June 3, 1986 primary election (at which the voters enacted the amendment to Section 6) in determining that there were no triable issues of fact
 
 
 [7]
 In re Rigden, 795 F.2d 727, 731-32 (9th Cir.1986)
 
 
 [8]
 The state's interest in the structure of its government is "super" compelling because of its constitutional significance. The guarantee clause commits the United States, including the courts of the United States, to protect the structure chosen by the citizens of each state. In this sense, structure is more compelling than corruption, for example, which is an evil that the state has a "compelling" interest in avoiding but which lacks the constitutional underpinnings of the state's form of government. Having recognized this, the state's interest in this case is to be weighed in accordance with accepted First Amendment jurisprudence
 
 
 [9]
 This power reposing in the citizens of each state is also basic to our federal system. "The federal Constitution forms a happy combination [between a large republic and a small one]; the great and aggregate interests being referred to the national, the local and particular to the State legislatures." The Federalist No. 10, at 22 (J. Madison)(R. Fairfield ed. 1981). See also, Oregon v. Mitchell, 400 U.S. 112, 125, 91 S.Ct. 260, 265, 27 L.Ed.2d 272 (1970)(Black, J.) ("[n]o function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution ... the nature of their own machinery for filling local public offices"); FERC v. Mississippi, 456 U.S. 742, 790 n. 28, 102 S.Ct. 2126, 2153 n. 28, 72 L.Ed.2d 532 (1982) (O'Conner, J., concurring in part and dissenting in part)(quoting I. Silone, The School for Dictators 119 (W. Weaver trans.): "[a] regime of freedom should receive its lifeblood from the self-government of local institutions. When democracy, driven by some of its baser tendencies, suppresses such autonomies, it is only devouring itself.... [I]f the central government's representative runs the city and the province, ... you can no longer speak of democracy")
 
 
 [10]
 Merritt makes the further point that "the tenth amendment underscores the need to enforce the federalism principle found in the guarantee clause. The structure of the Constitution, which clearly contemplates a federal system, likewise affirms the importance of interpreting the guarantee clause as a restraint on federal power." Id. at 2 n. 8
 
 
 [11]
 Geary v. Renne, No. CV-87-4724, at 4 (Order filed April 27, 1987)
 
 
 [12]
 "It is not helpful to ponder what is 'less restrictive' without thinking about the functions the rules serve and how these functions would be affected by 'less restrictive alternatives.' Every alternative is more restrictive than some other one." Stevenson v. State Bd. of Elections, 794 F.2d 1176, 1180 (7th Cir.1986) (Easterbrook, J., concurring)(emphasis in original)
 
 
 [13]
 See, e.g., Buckley, 424 U.S. at 17-19, 96 S.Ct. at 633-35; Bellotti, 435 U.S. at 790, 98 S.Ct. at 1424; FEC v. National Right to Work Comm., 459 U.S. 197, 205-07, 103 S.Ct. 552, 558-59, 74 L.Ed.2d 364 (1982); Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (no precedent on point)
 
 
 [14]
 See, e.g., Bellotti, 435 U.S. at 790, 793, 98 S.Ct. at 1424, 1425
 
 
 [15]
 Compare Bellotti, 435 U.S. 765, 98 S.Ct. 1407 (without showing that relative voice of corporation has been overwhelming or even significant in influencing referenda, or that there has been any threat to the confidence of the citizenry in government, argument that participation would exert undue influence is not persuasive) and Eu, 109 S.Ct. at 1019 (state had failed to submit " 'a shred of evidence' " that regulations of party internal affairs helped minimize party factionalism) (quoting Ninth Circuit opinion, 826 F.2d at 833, in turn quoting Civ. No. C-83-5599 (N.D.Cal. May 3, 1984) with Jenness, 403 U.S. 431, 91 S.Ct. 1970); American Party of Texas v. White, 415 U.S. 767, 782, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974); Storer v. Brown, 415 U.S. at 736, 94 S.Ct. at 1282; Munro v. Socialist Workers Party, 479 U.S. at 194-95, 107 S.Ct. at 537-38 (states are not required to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to imposition of reasonable restrictions on ballot access; otherwise, state's political system would have to sustain some level of damage before legislature could take corrective action)
 
 
 [16]
 Order Denying Defendants' Motion to Vacate Judgement, Civ. No. C-87-4724 (N.D.Cal. June 9, 1988), 1-2
 
 
 [17]
 See n. 2, supra. These statutes could be taken to define what a "nonpartisan" election means. On the other hand, they could reasonably be characterized as merely the procedures for a nonpartisan election that the state has chosen so far. As such they would neither be definitive, nor indicative of how much baggage a nonpartisan election can carry and still be nonpartisan. There is no basis in the record in this case to make this kind of determination, one way or the other
 
 
 [18]
 Because "political party" is elsewhere defined to refer to ballot-qualified organizations, the parties affected are the Democratic Party (Cal.Elec.Code Secs. 8500-8945), the Republican Party (Secs. 9000-9510), the American Independent Party (Secs. 9600-9745), and the Peace and Freedom Party (Secs. 9750-9855)
 
 
 [19]
 While it is irrelevant for constitutional purposes that the voters rather than a legislative body enacted Sec. 6(b), Citizens Against Rent Control v. Berkeley, 454 U.S. 290, 295, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981), in this particular case it is not without significance that the decision to limit party endorsements in nonpartisan elections was made by the very people who are the members and the constituents of the parties whose speech was limited. Members of the state central committees are indirectly elected by the people. See Cal.Elec.Code Sec. 8660. Thus Sec. 6(b) was not the product of a representative body acting out of paternalistic or preservationist instincts, but of the people themselves, burdening their own instrumentalities. See Bellotti, 435 U.S. at 791 n. 31, 98 S.Ct. at 1424 n. 31 ("[g]overnment is forbidden to assume the task of ultimate judgment, lest the people lose their ability to govern themselves"); cf. Buckley, 424 U.S. at 93-97, 96 S.Ct. at 670-72 (state may not "unnecessarily burden either a minority party's or an individual candidate's ... interest in the continued availability of political opportunity") (citations omitted); American Party of Texas v. White, 415 U.S. at 780-81, 94 S.Ct. at 1305-06 (state must afford minority political parties a real and essentially equal opportunity for ballot qualification)
 
 
 [20]
 Argument in Favor of Proposition 49 (to amend Section 6), California Ballot Pamphlet, Primary Election, June 3, 1986, p. 26. See Lee, The Politics of Nonpartisanship 102-104 (1960), and discussion in Unger, 37 Cal.3d at 616, 209 Cal.Rptr. 474, 692 P.2d 238
 According to Lee's survey, there was "public or openly visible activity" on the part of county committees, local political clubs, party officials or representatives in local city, county or school elections in only 25% of the counties surveyed. Lee at 102-103, Table 32. Whether there was any involvement in judicial elections even in those counties is unclear.
 Regardless, it is incorrect to infer from Lee, as the majority appears to do, that political parties endorsed candidates for nonpartisan office in 25% of the counties prior to 1986. Majority opn., supra, at 282 ("Nevertheless, because the legal status of such endorsements was unclear, political parties did not endorse candidates in 75% of California counties"). Table 32, from which that statistic is drawn, concerns "public or openly visible activity," not endorsements. Table 33, which shows the type of political activity reported on the survey, indicates that public endorsement of candidates occurred in 4 counties (about 10%)--although there is no way of telling from the survey whether the occurrence was singular, sporadic or repetitive.
 Referring to the Lee survey, or relying on it to suppose that party endorsements caused no harm to the nonpartisan structure before Sec. 6(b) was adopted in 1986, illustrates why it is risky to make decisions based on assumptions without an evidentiary basis. While Lee is no doubt an able scholar, neither the methodology nor significance of the results he reports has been tested by cross-examination.
 
 
 [21]
 When deciding whether laws that impinge on associational freedoms violate the First Amendment:
 [A] court ... must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State, as justifications for the burden imposed by its rule. In passing judgment, the court must not only determine the legitimacy and strength of each of those interests: it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.
 Tashjian, 479 U.S. at 214, 107 S.Ct. at 548-49 (quoting Anderson v. Celebrezze, 460 U.S. at 789, 103 S.Ct. at 1573). While the restrictions embodied in Sec. 6(b) implicate both First and Fourteenth Amendment rights, Eu, 109 S.Ct. at 1020, the magnitude of the injury has to be measured against both the strength of the interest, and the alternatives available. The district court did not touch these bases because of its assumption that the state's interest was corruption and that alternative means would be less restrictive.
 
 
 [22]
 States have a greater interest in regulating statewide or local elections than national elections. Anderson, 460 U.S. at 795, 103 S.Ct. at 1573. Indeed, one purpose of nonpartisan elections is to insulate state and local elections from the national issues that are the natural focus of national political parties. See Note, Local Nonpartisan Elections, Political Parties and the First Amendment, 87 Colum.L.Rev. at 1679-81
 It is no answer to suggest, as did the dissent in the original panel opinion, that "[t]here may be no Republican, or Democratic, or Libertarian way to build a city jail, but there may very well be Republican, Democratic or Libertarian positions on whether a jail should be built and who should be taxed for it." 880 F.2d at 1084. There is nothing about Sec. 6(b) which would impede the Republican Party, or the Democratic Party, or the Libertarian Party, or the Peace and Freedom Party from expressing their views on such matters.
 
 
 [23]
 See Tashjian, 479 U.S. at 220, 107 S.Ct. at 551-52 ("To the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise")
 
 
 [24]
 Indeed Lee's survey includes an appraisal which shows that party activity helped in six cities where both Republican and Democrats were active, and made no difference in three; when only Democrats were active, it helped in two, made no difference in one, and hurt in two. Lee, The Politics of Nonpartisanship 104 (Table 34)
 
 
 [25]
 Majority opn., supra, at 284-85
 
 
 [26]
 As Bellotti says, "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." 435 U.S. at 777, 98 S.Ct. at 1416
 
 
 [27]
 The ban on support and opposition is more problematic. See discussion, infra at 304-05, and n. 40
 
 
 [28]
 Cal.Elec.Code Sec. 36
 
 
 [29]
 In other words, if Diane Feinstein, John Van de Kamp, and Pete Wilson were running for mayor, and if the Democratic Party endorsed Van de Kamp and the Republican Party endorsed Wilson, for all practical purposes the process would parallel the partisan track. The only difference would be that in the case of the nonpartisan track, the decision about which candidate would carry the party banner would be made by the party, not by the people as is their prerogative in the partisan track. The irony is, this would allow political parties even greater power in the nonpartisan track than in the partisan. That not only runs counter to what the voters intended when they amended Section 6 of the California Constitution, but would effectively destroy the nonpartisan system--and that runs counter to the intent of Article IV, Sec. 4 of the United States Constitution
 
 
 [30]
 That certainly was the judgment of supporters of the amendment to Section 6. See, e.g., an editorial in The Sacramento Bee, To Protect Non-Partisan Elections, which opined that "[t]he principal danger is that the decision [Unger ] opens the way ... to school boards whose members make curricular decisions according to the political orientation of the parties that support them and, worse, look toward advancement by the party as a reward for faithful service in 'non-partisan' positions." August 13, 1985, at B6, col. 1 (final ed.) (editorial), quoted in 87 Colum.L.Rev. at 1681. See also California Ballot Pamphlet, p. 26 ("To assure that our courts will not be manipulated by political bosses, your yes vote on Proposition 49 [to amend Section 6] is absolutely necessary.")
 
 
 [31]
 A Columbia Law Review Note proposes other means which the author suggests are also less restrictive: one would be to increase party competition, thereby rendering candidates less vulnerable to manipulation because they would have alternative means of support; another, to appoint administrative local officials rather than elect them. 87 Colum.L.Rev. at 1698-99. The former relates primarily to the state's interest in corruption but would turn its interest in structure on its head; the latter would too, in that presumably those administrative personnel would be appointed by persons elected in partisan elections. Neither means comports with a nonpartisan structure, and that is a choice both the guarantee clause and the Tenth Amendment leave for the people to make
 
 
 [32]
 The state could not, for example, justify a ban on endorsements by special interest groups on the ground that government should be "non-special interest." The state's interest in the structure of government goes to such things as whether it is to be partisan or nonpartisan, town meeting or city council, appointive or elective; the state could not rely on an interest stemming from the guarantee clause to justify a government based on religious beliefs or race or ideas. Such things have nothing to do with structure
 By the same token, if the state's asserted interest is corruption, its justification for banning endorsements by political parties is weakened because the corrupting effect of endorsements or support by a special interest group may be essentially the same. However, clout of a special interest group has no relevance to the state's interest in the structure of government. Special interest groups have no access to the ballot and their membership may cut across party lines. Their raison d'etre is to influence voters and officeholders issue by issue, sometimes in accord with the views of a political party, sometimes not. They are quintessentially non-party organizations. By contrast, political parties have ballot access, are comprised of persons of the same political persuasion, and exist to win elections and run governments. See Moore v. Panish, 32 Cal.3d 535, 186 Cal.Rptr. 475, 652 P.2d 32 (1982). They are quintessentially the opposite of non-party or nonpartisan.
 
 
 [33]
 Majority opn., supra, at 283
 
 
 [34]
 The Hatch Act does not prohibit political activity in connection with nonpartisan elections or with questions "not specifically identified with a National or State political party." 5 U.S.C. Sec. 7326. Thus, it specifically addresses the corrupting influence that political party organizations have on the administration of the law in a nonpartisan context
 
 
 [35]
 That would be indefensible. Bellotti, 435 U.S. 765, 98 S.Ct. 1407; J. Ely, Democracy and Distrust 111 (1980) (state cannot regulate political speech because of "a fear of how people will react to what the speaker is saying"). It would also be inconsistent with the intent of the people when they adopted Sec. 6(b). For example, the proponents argued:
 To assure that our courts will not be manipulated by political bosses, your yes vote on Proposition 49 is absolutely necessary.
 WHO WOULD TRUST THE FAIRNESS OF TRIALS TO JUDGES WHO WERE CHOSEN--NOT BECAUSE THEY ARE IMPARTIAL--BUT BECAUSE THEY OWE ALLEGIANCE TO THE POLITICAL PARTIES WHICH GOT THEM ELECTED?
 WHO WANTS TO RELY ON THE DECISIONS OF JUDGES WHO ARE CHOSEN--NOT BECAUSE THEY ARE WISE OR BECAUSE THEY KNOW THE LAW--BUT BECAUSE THEY HAVE PROMISED TO TOE THE PARTY LINE?
 Californians do not want their judges to become beholden to political parties.
 UNLESS YOU VOTE YES ON PROPOSITION 49, JUDGES MAY WELL BE INDEBTED TO PARTY BOSSES TO WIN ELECTIONS. THEIR JOBS WILL DEPEND ON IT.
 Local officeholders support this amendment and are equally concerned that partisan electioneering will harm decision-making at the local level. They are concerned that the more they have to rely on money, help, and endorsements from political machines, the more they will owe the political machines.
 Local officeholders do not want to have to check with the party bosses before they make decisions important to their constituents!
 California Ballot Pamphlet at 26.
 
 
 [36]
 Everyone knows, for example, that Mayor Bradley is a Democrat. That knowledge--or the communication of information that the Democratic Party or some group identifying itself with Democratic causes favors his election as Mayor--would not likely spoil anyone but the candidate. As the Mayor's brief in this case points out, the problem is not "the impact that endorsements may have on voters' choices but rather [their] indirect impact on elected officials' independence from partisan political pressures."
 
 
 [37]
 Declaration of Richard Mountjoy, E.R. 72. (Although I have some concern about citing the Mountjoy Declaration because it arguably was not part of the summary judgment record, it was apparently reviewed in connection with the motion to vacate. In any event what he says is a matter of common sense: it is unlikely that a party endorsement would appear on the ballot information pamphlet unless the candidate had agreed to it.) Opposing or supporting a candidate, on the other hand, is closer to a restriction on independent expenditures, which Buckley declined to approve
 
 
 [38]
 See also California Medical Ass'n v. FEC, 453 U.S. 182, 201, 101 S.Ct. 2712, 2724, 69 L.Ed.2d 567 (1981). In upholding limitations on union and corporate campaign activity, the Supreme Court stated that the "differing structures and purposes" of entities "may require different forms of regulation in order to protect the integrity of the electoral process." The Court further distinguished restrictions placed on individuals and unincorporated associations, on the one hand, and unions and corporations on the other
 
 
 [39]
 Majority opn., supra, at 285
 
 
 [40]
 To eliminate the ban on opposition and support would also decrease the appearance of prearrangement and coordination that Buckley found to be indicators of corruption. To the same extent, the risk of a direct quid pro quo is lessened. Limiting Sec. 6(b) to endorsements would also obviate the problem of how to enforce a restraint on "opposing" or "supporting" on the margin, for instance, whether Republican Party opposition to Mayor Bradley's campaign for Governor (a partisan office) would violate its obligation not to "oppose" him in his capacity as a candidate for, or officeholder of, the mayoralty (a nonpartisan office)
 
 
 [41]
 The case comes to us in a curious posture. Relating to the issues presented in this case and in connection with the motion for summary judgment, the plaintiffs produced the affidavits of Arlo Hale Smith and Terence Falkner. These declarations went to standing, not to substantive issues. The city presented no evidence in opposition. Subsequently, the City submitted several declarations in connection with its motion to vacate, as did plaintiffs in opposition. In denying the motion to vacate, the district judge indicated that he had reviewed the motion but was not persuaded to change his decision. In that sense, the declarations are a part of the record. However it is unclear that they form any part of the basis of the district's order granting partial summary judgment
 
 
 [42]
 See Mandel v. Bradley, 432 U.S. 173, 177-78, 97 S.Ct. 2238, 2241, 53 L.Ed.2d 199 (1977) (remanded "to permit further findings with respect to the extent of the burden imposed" by state electoral regulations)
 
 
 [1]
 I agree with Judge Reinhardt that an endorsement by a political party in a non-partisan election is less evil and corrupting than "massive political contributions." Ante at 287. The question whether California can constitutionally slay that dragon, however, is not before us in this matter
 
 
 [2]
 The four assigned justices were retired Presiding Justice Gordon L. Files, retired Associate Justice Bertram D. Janes, retired Associate Justice Richard M. Sims, Jr., and retired Assciate Justice Rodney K. Potter
 
 
 [3]
 The initiative was presented to the voters in this manner:
 To assure that our courts will not be manipulated by political bosses, your yes vote on Proposition 49 is absolutely necessary.
 WHO WOULD TRUST THE FAIRNESS OF TRIALS TO JUDGES WHO WERE CHOSEN--NOT BECAUSE THEY ARE IMPARTIAL--BUT BECAUSE THEY OWE ALLEGIANCE TO THE POLITICAL PARTIES WHICH GOT THEM ELECTED?
 WHO WANTS TO RELY ON THE DECISIONS OF JUDGES WHO ARE CHOSEN--NOT BECAUSE THEY ARE WISE OR BECAUSE THEY KNOW THE LAW--BUT BECAUSE THEY HAVE PROMISED TO TOE THE PARTY LINE?
 Californians do not want their judges to become beholden to political parties.
 UNLESS YOU VOTE YES ON PROPOSITION 49, JUDGES MAY WELL BE INDEBTED TO PARTY BOSSES TO WIN ELECTIONS. THEIR JOBS WILL DEPEND ON IT.
 Local officeholders support this amendment and are equally concerned that partisan electioneering will harm decision-making at the local level. They are concerned that the more they have to rely on money, help, and endorsements from political machines, the more they will owe the political machines.
 Local officeholders do not want to have to check with the party bosses before they make decisions important to their constituents!
 California Ballot Pamphlet at 26.
 
 
 [4]
 See W. Shakespeare, Julius Caesar, act I, scene ii, 11. 194-95 ("Yond Cassius has a lean and hungry look ... such men are dangerous." (emphasis added))
 
 
 [5]
 The fact that social issues can be successfully exploited to influence the outcome of a contested judicial election is vividly illustrated by the political fate of Los Angeles Superior Court Judge Alfred Gitelson in the 1970 general election
 Sometime prior to 1970, Judge Gitelson ordered the Los Angeles Unified School District to integrate its classes. Judge Gitelson sought reelection in 1970. Attorney William P. Kennedy ran against Judge Gitelson and forced him into a runoff election. The day after the primary election, Mr. Kennedy summarized his campaign in the following press statement:
 My objection to the judge is based primarily on his decision requiring school integration by forced bussing.... [This election is] a referendum by the voters of Los Angeles on the issue. If they want forced bussing, vote for Gitelson, if not, vote for me.
 Boyarsky, Gitelson Forced into Runoff; Bussing Is Issue, His Foe Says, L.A. Times, June 4, 1970, at 24, col. 3.
 Mr. Kennedy did not explain to the press that his public position on a matter pending in the court system would, of course, compel his recusal, if elected, on any matter involving school integration or "forced bussing."
 Judge Gitelson defined the issue raised by Kennedy's campaign strategy differently:
 If judges are going to make their decision[s] on the basis of what people would like, then there can't be any justice.
 Id. at 1, col. 5. Judge Gitelson lost the election to Mr. Kennedy on November 3, 1970. The Supreme Court of California affirmed Judge Gitelson's decision on June 28, 1976. Crawford v. Board of Educ., 17 Cal.3d 280, 551 P.2d 28, 130 Cal.Rptr. 724 (1976).
 If the Kennedy-Gitelson election campaign were being conducted in this election year, without the protection of subsection (b) of article II, section 6, the political parties would have the opportunity to endorse or oppose the candidates' positions in this nonpartisan election. If a party adopted Mr. Kennedy's point of view, either out of conviction or simply because he is a loyal member, it would be entitled to endorse him and ask the voters to vote "no" on bussing. By the same token, another party would be free to support Judge Gitelson, regardless of his views or qualifications, to avoid losing that office to a candidate who was registered with a rival political organization. The people of California have wisely chosen to preclude the injection of state central committee partisan concerns and "priorities" in elections dealing with local problems that require nonpartisan solutions.
 
 
 [6]
 I will bind myself to your service in this world,
 To be at your beck and never rest nor slack;
 When we meet again on the other side,
 In the same coin you shall pay me back.
 Goethe's Faust 58 (L. MacNeice trans.1951).